IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

**THE B & F SYSTEM, INC.**,

        Plaintiff,

v.

**LLOYD J. LEBLANC JR., et al.**,

        Defendants.

Civil Action No. 7:07-CV-192 (HL)

## ORDER

This case is before the Court on Defendants' Motion for Summary Judgment (Doc. 152) and Plaintiff's Motion for Summary Judgment (Doc. 159). After consideration of the briefs, exhibits, and pleadings submitted by the parties, the Court grants, in part, and denies, in part, both Motions.

## I.    BACKGROUND

This case is can best be compared to a contested divorce with child custody issues and both parties fighting over the dog.[1] In essence, it is a business divorce. The parties are well versed in the facts surrounding their claims, so the Court will not endeavor to address all 519 allegedly material facts set forth by the parties, especially as many of them are not material. The Court will, however, set out the general facts underlying the parties' claims and counterclaims. In addition, before getting into the

_____

[1] "In the ornithology of litigation this case is a tomtit furnished with a garb of feathers ample enough for a turkey." Lukens v. Ford, 87 Ga. 541, 13 S.E. 949, 951 (1891).

facts, the Court believes it prudent to set out the various acronyms and abbreviations mentioned in this Order, along with a citation to where they first appear.

| The B & F System, Inc. | B & F | p. 2 |
|---|---|---|
| United States Patent and Trademark Office | USPTO | p. 3 |
| Maxam Independent Distributorship Agreement | MIDA | p. 4 |
| Service Mark License Agreement | SMLA | p. 4 |
| Maxam Wholesale of Atlanta, Inc. | MWA | pp. 4-5 |
| Productos Mexicanos Don Jose, Inc. | PMDJ | p. 7 |
| Direct Source Imports, Inc. | DSI | p. 8 |
| Maxam Independent Distributor | MID | p. 21 |
| Anticybersquatting Consumer Protection Act | ACPA | p. 50 |
| Georgia Uniform Deceptive Trade Practices Act | GUDTPA | p. 50 n. 14 |
| Georgia Trade Secrets Act | GTSA | p. 56 |
| Georgia Fair Business Practice Act | GFBPA | p. 83 |

Plaintiff, The B & F System, Inc. ("B & F"), is a wholesale distributor of more than 200 different imported products, including electronics, cookware, cutlery, jewelry, and clothing apparel. Various manufacturers in China mass-produce certain products which B & F imports and distributes wholesale.

B & F owns trademarks for the words "MAXAM USA" and "MAXAM," and those trademarks are registered on the Principal Register of the United States Patent and Trademark Office ("USPTO").[2] B & F also owns a design-only trademark which consists of "a configuration of a round pot or pan lid knob having a button thereon for opening a steam control valve that is part of the lid knob" (the "lid knob trademark").[3]

Defendant Lloyd J. LeBlanc Jr. ("Lloyd") began selling B & F's products out of his Tifton home in the 1970s. He was so successful that he built a showroom and warehouse in Tifton in 1981. Lloyd's distribution center was the first branch of B & F, albeit independently owned. Thereafter, Lloyd, doing business as Maxam Wholesale of Georgia, operated the Tifton warehouse as a distribution center and branch office of B & F throughout the first half of the 1980s. Lloyd is married to Defendant Edna LeBlanc ("Edna"), who kept the books for Lloyd. Defendants Jeffrey LeBlanc ("Jeff") and Lloyd J. LeBlanc III ("Jody") are their children.

---

[2] B&F owns the following trademarks registered on the Principal Register of the USPTO: MAXAM USA, U.S. Registration No. 2,467,030 (registered July 10, 2001); MAXAM, U.S. Registration No. 1,262,404 (registered December 27, 1983); MAXAM, U.S. Registration No. 1,181,160 (registered December 8, 1981); MAXAM, U.S. Registration No. 1,313,179 (registered July 8, 1985); MAXAM, U.S. Registration No. 1,174,868 (registered October 27, 1981); and MAXAM, U.S. Registration No. 885,723 (registered February 10, 1970). (Pl's Exs. 163-168).

[3] The lid knob trademark is assigned Reg. No. 3,266,496 (registered July 17, 2007) on the Supplemental Register of the USPTO. (Pl's Ex. 169).

On November 21, 1986, the Tifton branch of B & F formally became an independent distributor, as Lloyd d/b/a Maxam Wholesale of Georgia entered into a Maxam Independent Distributorship Agreement ("MIDA") with B & F. Bill Meyer was the president of B & F at that time. The MIDA was drafted by B & F.

Also on November 21, 1986, B & F and Lloyd d/b/a Maxam Wholesale of Georgia entered into a Service Mark License Agreement ("SMLA") for the service mark "MAXAM." Through the SMLA, Lloyd d/b/a Maxam Wholesale of Georgia was given a license to use the "MAXAM" mark for retail and wholesale sales services, to use the "MAXAM" mark as part of his business title, and to otherwise enjoy the goodwill associated with the mark. The SMLA was also drafted by B & F.

In 1991, Lloyd and Edna purchased all of the assets of another B & F distributor, Maxam Wholesale of Atlanta. For the next few years, Lloyd did business in Atlanta as Maxam Wholesale of Atlanta, and separately did business at the Tifton warehouse as Maxam Wholesale of Georgia. Eventually Maxam Wholesale of Georgia was merged into Maxam Wholesale of Atlanta, with the combined operation located at the Tifton warehouse being known as Maxam Wholesale of Atlanta. Both Maxam Wholesale of Georgia and Maxam Wholesale of Atlanta were operated by Lloyd as sole proprietorships. In December of 2004, Lloyd incorporated Defendant Maxam Wholesale

4

of Atlanta, Inc. ("MWA").[4] He was MWA's sole shareholder. The MIDA and SMLA were never transferred or assigned from Lloyd d/b/a Maxam Wholesale of Georgia to MWA.

Jeff and Jody have both worked for Lloyd's business for a number of years, with Jody being in sales and business management, and Jeff being in general sales management and computer operations. Neither Jeff nor Jody ever entered into a distributorship agreement or service mark license agreement with B & F.[5]

Lloyd, Jody, and Jeff split the profits from Maxam Wholesale of Georgia, Maxam Wholesale of Atlanta, and MWA equally between themselves. Jody left the business for a five year period between 1996 and 2001, when he started a company called Productos Mexicanos Don Jose, which imported Mexican pastries. After ending the pastry business in 2001, Jody returned to work for Maxam Wholesale of Atlanta.

In May of 1999, Jeff registered the domain name maxamwholesale.com. Shortly thereafter, he created a website at www.maxamwholesale.com with an online shopping cart for the customers of Maxam Wholesale of Atlanta to visit, view available products, and place orders. On February 15, 2005, Jeff registered the domain name maxamwholesale.net, and thereafter created a website at www.maxamwholesale.net

---

[4] MWA was administratively dissolved by the Secretary of State on September 7, 2010. (Pl.'s Ex. 190).

[5] B & F did not enter into any sort of agreement with any of the other Defendants either.

which served as a shadow site for www.maxamwholesale.com so that anyone visiting www.maxamwholesale.net would be linked directly to the www.maxamwholesale.com website.

Jeff contacted search engines like Google and informed them of the websites. Certain metatags were used on the websites, including "maxam," "wholesale," "clocks," "knives," and "waterless cookware." [6] The search engines used the metatags in performing searches and displaying results. By 2005, assisted by the two websites, Maxam Wholesale of Atlanta had expanded its customer base to customers all over the United States and Canada, and revenues had grown from about $1 million per year to $5 million per year.

In 2005, John Meyer, Bill's son, took over as president of B & F. According to Defendants, John's ascendancy to the presidency triggered the dissolution of the marriage. B & F began hosting the www.maxamwholesale.com website, whereas the website was previously hosted on the computer server at the Tifton warehouse and was maintained by Jeff. John proposed the use of a new computer system and software, and also proposed a change in the business relationship between B & F and Maxam

---

[6] A metatag consists of "words and phrases that are intended to describe the contents of a website." The descriptions are embedded within the website's computer code, and affect the results of a search in ways a computer user cannot see, like "rank[ing] a webpage that contains the search terms within its meta tags higher in the list of relevant results." N. Am. Med. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1217 n. 2 (11th Cir. 2008).

Wholesale of Atlanta such that Maxam Wholesale of Atlanta would become a customer of B & F, rather than an independent distributor.

The gross sales figures for Maxam Wholesale of Atlanta held steady for 2002 through 2004, but began to fall in 2005 and steadily declined thereafter. The sales for 2002, 2003, and 2004 were $4,377,873.36, $4,260,749.45, and $4,364,119.88, respectively. The sales for 2005, 2006, and 2007 were $3,536,416.07, $2,851,312.74, and $889,101.74, respectively.

Because of the declining sales figures and concerns over changes in business practices, in the spring of 2006 Jody began researching the possibility of importing products from China, with which Jeff and Jody could establish a wholesale business of their own to compete with B & F. In August of 2006, Lloyd and Edna decided to financially back their sons in establishing the business. Lloyd and Jody traveled to China to find suppliers and pick out products to import. In October of 2006, Lloyd and Jeff went back to China to attend the Canton Fair, a large trades fair where Chinese manufacturers exhibit available products. During this time, Lloyd was still serving as a distributor for B & F.

In November of 2006, Jody and Jeff placed an order for a shipment of leather products from a Chinese manufacturer, Shanghai Hundred Trust. This order was placed through Defendant Productos Mexicanos Don Jose, Inc. ("PMDJ") d/b/a Direct Source Imports. PMDJ was incorporated on January 24, 2002, administratively dissolved in 2005, and reinstated on August 22, 2006. Jody initially owned the

corporation, and gave a 50% interest in PMDJ to Jeff in 2006, though no stock certificates have been formally issued. During the next six months, Jeff and Jody, through PMDJ d/b/a Direct Source Imports, accumulated additional Chinese manufactured goods, similar to those of B & F. Between November 1, 2006 and May 15, 2007, Jeff and Jody, through PMDJ d/b/a Direct Source Imports, purchased and imported approximately $200,000 worth of leather goods, cutlery, and clocks. This inventory was stockpiled in the Tifton warehouse. The goods from China were purchased, imported, and stockpiled while both Jeff and Jody were working for MWA and sharing in the company's profits. Jeff and Jody both used their maxamwholesale.com email addresses in their Direct Source Import business dealings. The inventory owned by PMDJ was eventually transferred for no cost to Defendant Direct Source Imports, Inc. ("DSI"), which was incorporated on May 25, 2007. Jody and Jeff are the shareholders in DSI.

On August 1 and December 1, 2006, Lloyd and Edna signed documents under which they agreed to make loans to Jeff and Jody and Direct Source Imports, for an unspecified amount of money. (Pl.'s Exs. 55, 57). In total, Lloyd and Edna have loaned approximately $950,000 to Jeff and Jody for the operation of their business. The loans have not been repaid.

Also on December 1, 2006, Lloyd and Edna entered into a lease agreement with Direct Source Imports under which Direct Source Imports was to pay $200 per month for 1,000 square feet of space in the Tifton warehouse. Direct Source Imports was also

allowed to use the telephone lines and computer terminal located in the warehouse under the lease. (Pl.'s Ex. 58). On June 1, 2007, Lloyd and Edna and Direct Source Imports entered into an updated lease agreement under which Direct Source Imports leased the entire warehouse, the computers, and telephone lines for $500 per month. (Pl.'s Ex. 59). As of June 2009, Lloyd and Edna had been paid approximately $25,000 under these lease agreements.

In early May of 2007, B & F learned, through a check of manifest journals, that Direct Source Imports had imported leather products and clocks, with the final shipping destination as the Tifton warehouse. In a telephone call with Jody on May 15, 2007, Bill and John Meyer confirmed that Jody, as Direct Source Imports, had imported Chinese manufactured goods in some of the same categories of products that MWA was distributing on behalf of B & F. During that conversation, Bill and John informed Jody that B & F would send trucks to retrieve B & F's inventory of products from the Tifton warehouse.

Shortly after the conversation with Jody, Bill and John talked to Lloyd and Edna on the telephone. Bill and John confirmed that the Chinese manufactured goods had been imported by Jody as Direct Source Imports with Lloyd's knowledge. Bill and John informed Lloyd that B & F's inventory would be retrieved from the Tifton warehouse. However, John authorized Lloyd to purchase and retain approximately $62,000 worth of B & F products to fill back orders. B & F personnel subsequently retrieved all of the

unopened inventory of B & F products from the Tifton warehouse, leaving only the $62,000 in inventory purchased by Lloyd and the open display items.

On May 29, 2007, John faxed to Lloyd an incomplete letter dated May 22, 2007, then being crafted by B & F's attorneys. The letter directed Lloyd to cease any competitive activities, and to direct his sons to cease and desist their actions that in any way, directly or indirectly, were in competition with B & F. The letter, which was never completed and was only faxed to Lloyd, does not specifically state that the MIDA was terminated. (Pl.'s Ex. 11).

Lloyd stopped managing the Tifton warehouse. He left the continued operation of the warehouse to Jeff and Jody to transact as DSI on behalf of MWA in order to liquidate the remainder of the B & F products. Lloyd then began operation of "Factory Outlet," a retail store in Tifton. Lloyd and Edna subsequently organized Defendant LeBlanc's, LLC ("LeBlanc's").

Also on May 29, 2007, John mailed a letter to a large group of MWA's customers, informing them that "Maxam Wholesale of Atlanta, an independently owned and operated distributor, has ceased operation." The letter requested that MWA's customers place their orders with B & F at the Dallas home office. (Pl.'s Ex. 13). Then, on June 5, 2007, John mailed the same letter again to MWA's customers.

At the time of the May 15, 2007 conversations between John, Bill, Jody, Lloyd, and Edna, the websites located on the domains maxamwholesale.com and maxamwholesale.net were being hosted on B & F's computer server. Jeff contacted the

domain registration company and informed it that the domains would be hosted on a different server. When the host server was changed, Jeff was given control over the two websites, whose contents he changed several times. Immediately after taking control of the websites, Jeff removed the content and posted the following message on www.maxamwholesale.com: "This page copyright 2007 maxamwholesale.com all rights reserved. webmaster: jeff@maxamwholesale.com." The same message was posted on www.maxamwholesale.net, except it referred to the .net site instead of the .com site. The websites also displayed a toll free number used by both MWA and DSI. Also, according to Jeff, the metatags on the websites were disabled.

On May 16, 2007, John sent an email to Lloyd, Jeff, and Jody, stating: "I'm sure you guys understand that Direct Source Imports is not authorized to use our trademark 'Maxam Wholesale' even as a domain name such as Maxamwholesale.com and Maxamwholesale.net. Please stop pointing the web addresses to buydsi.com or anywhere else except bnfusa.com by noon Thursday May 17, 2007." (Pl.'s Ex. 12). John made an offer "to pay you $500 to facilitate the transfer of the domain names" to B & F. (Pl.'s Ex. 12). On June 12, 2007, John sent another email to Lloyd and Jeff asking that Jeff's reference to himself as "webmaster: jeff@maxamwholesale.com" on the two websites be removed "immediately as you are no longer authorized to use the name Maxam in any form." (Pl.'s Ex. 123).

Jeff did not remove the email address from either website, and instead added a notation that the two domain names were for sale. (Pl.'s Exs. 124-125). According to

Jeff, he found John's $500 offer to be "insulting," so he posted a "just as ridiculous" price for the domain names of $4 million each. (Pl.'s Exs. 126-127). In response, John emailed Lloyd, Jeff, and Jody on June 14, 2007 asking why they were "not accepting our offers for Maxam Wholesale.com & .net," and stating that he felt the LeBlancs were "still playing games," and that he "would appreciate your taking us a little more seriously." (Pl.'s Ex. 128).

Jeff responded to John's email on June 15, 2007, declaring that Jeff believed John's offer of $500 was not serious; that John was the one "playing games"; that Jeff would gladly entertain "a real offer for those two websites and/or Direct Source Imports, Inc."; that Jeff knew the trademark "MAXAM" was a B & F trademark so that www.maxamwholesale.com and www.maxamwholesale.net could only be utilized by a limited number of companies, namely those also owning a trademark in the name "Maxam"; and that Jeff would be discussing the sale of the domain names and websites only with some of the other "owners of MAXAM trademarks and businesses using the term within their legal business names." (Deposition of Jeffrey LeBlanc, Pl.'s Ex. 119). Jeff tried to make contact with businesses holding trademarks in the name "Maxam" but only received responses from two companies, a vitamin company and a construction company. During those contacts, there was never any mention of a price for the domain names or websites, or offers for sale or purchase. Jeff remained the registrant of the

two domain names until June of 2011, when the Court ordered Defendants to transfer maxamwholesale.com and maxamwholesale.net to B & F. (Doc. 189).[7]

On or about July 17, 2007, Jeff added a "statement in explanation of the closing of Maxam Wholesale" to www.maxamwholesale.com and www.maxamwholesale.net. The statement, signed by Jeff, read:

> As you are probably aware by now, all Maxam Wholesale locations have been closed by B&F System Inc.
>
> Jeff and Jody LeBlanc as well as Maria, Rosa, Suzie and all the rest of us here want to thank you for your business and hope to continue our fine relationship with you.
>
> Jody and Jeff LeBlanc have formed the new corporation Direct Source Imports, Inc.
> Currently the main product lines for Direct Source Imports, Inc. are cookware, cutlery, leather goods, and clocks.
> Direct Source Imports, Inc. is located in the same warehouse that we have been working in for the past 25 years.
>
> We have a brand new web site at www.buydsi.com where a new online catalog is in development.
>
> Please feel free to visit our showroom at our usual hours of 9-5 Monday-Friday.
> And as always, you are welcome to call us on our toll free phone line to place your orders or to just catch up on the latest hot items.
>
> Looking forward to a great fall/winter season.

---

[7] The Court assumes this transfer was done as ordered. Neither party has indicated that the transfer did not happen.

(Pl.'s Ex. 129).

The websites also contained the following: "**PLEASE NOTE**: Direct Source Imports, Inc. is in no way affiliated with B&F System, Inc. If instead you wish to contact B&F System, Inc. please visit **http://www.bnfusa.com**." (Pl.'s Ex. 129).

Sometime around August 22, 2007, Jeff removed the explanation of the closing from the two websites. He inserted a banner advertisement which visitors to the websites could click and link to www.buydsi.com. Each banner ad identified DSI as the advertiser.

On November 5, 2007, John sent an email to the LeBlancs asking that they stop using the trademark "MAXAM" "to sell products for another company such as Direct Source Imports," referencing www.maxamwholesale.com and www.maxamwholesale.net. (Pl.'s Ex. 14).

On November 12, 2007, John sent the following written notice to Lloyd by mail:

> In addition to previous emails giving you notice to stop using the mark 'MAXAM' this is another written notice to terminate the Service Mark License Agreement, signed and dated 11/21/86.
>
> Immediately cease from using the mark 'MAXAM' in any form whatsoever; see item "6" on the enclosed copy of the Service Mark License Agreement. With the termination of this agreement you no longer have the right or approval to use the mark 'MAXAM' which is owned by B&F System, Inc.

(Pl.'s Ex. 16).

14

In response to the November 12 letter from John, Jeff removed all content from www.maxamwholesale.com and www.maxamwholesale.net. Anyone accessing those websites after that time found a completely blank page. Jeff acknowledges that the domain names are probably not worth much now because they have not had any content on them since 2007.

Sometime after the SMLA was terminated on November 12, 2007, Jeff made requests of some internet companies and websites for the removal of www.maxamwholesale.com and www.maxamwholesale.net from their advertising systems and websites. Prior to the termination, and while Lloyd was still an authorized distributor, the webmaster for www.school-for-champions.com had posted the following on a list of waterless cookware companies:

> Maxam
> <u>Maxam Wholesale</u> - <u>Kitchenware page</u>
> Tifton, Georgia
> (229) 386-5910

This listing had not been requested by Jeff. After the November 12 SMLA termination, Jeff sent a request to www.school-for-champions.com which stated:

> Please remove your listing for Maxam at http://www.school-for-champions.com/health/waterless2.htm#Maxam
>
> We have dissolved the company.
> Also, we have dissolved the web site.
>
> Instead please list:
>
> Direct Source Imports, Inc.

Tifton, Georgia

(229) 386-5910

www.buydsi.com

If you have questions please call.

Jeff - USA

(Pl.'s Ex. 120).

Jeff's request was eventually posted on the www.school-for-champions.com website on or about December 21, 2007 under the heading "Maxam Cookware no longer in business." (Pl.'s Ex. 120). The webmaster answered Jeff's request by posting: "Thank you for the information. We have now listed Maxam as no longer in business. Do you support previous customers?" (Pl.'s Ex. 120). Subsequent to this December posting, the following notation appeared in the list of waterless cookware companies maintained by the www.school-for-champions.com webmaster:

Maxam

No longer in business as of 2007.

(Pl.'s Ex. 120).

DSI continues to operate in the Tifton warehouse. Lloyd gave to DSI the warehouse equipment, furniture, office equipment, and the computers and software previously used by MWA. In early 2008, DSI secured new telephone numbers for its business. Prior to that time, DSI used the telephone number originally associated with Maxam Wholesale of Atlanta and MWA. Customers calling the telephone number were told "[t]hat B & F System had decided to close down the Maxam Wholesale of Atlanta,

16

Inc. operation," or that "Maxam Wholesale of Atlanta, Inc. were out of business, or Maxam Wholesale of Georgia - - Atlanta was out of business." (Deposition of Jody LeBlanc, p. 331). If a customer called and wanted to buy from DSI, DSI employees said they would be "glad to sell to them." (Jody LeBlanc Dep., p. 331).

DSI's main product lines are cookware, cutlery, leather goods, and clocks, all of which were also sold by Maxam Wholesale of Atlanta and MWA. Like B & F, DSI purchases items from various Chinese manufacturers, which it then sells wholesale. DSI and B & F import similar leather bags, leather bag sets, leather clothing, cutlery sets, and stainless steel cookware sets. Many of B & F's cookware items utilize the steam control valve lid knob described by the lid knob trademark. DSI also uses a steam control knob on some of its cookware.

DSI's sales are generated primarily through word of mouth, the internet, and telephone sales calls. DSI has done some internet, magazine, and newspaper advertising. B & F advertises through product catalogs, mailers, flyers, and advertising postcards. It also has a website with a shopping cart located at www.bnfusa.com which was established in 2001 or 2002. According to Bill Meyer, B & F has spent over $4.5 million over the past ten years on advertising.

On December 6, 2007, B & F filed a ten-count lawsuit against Lloyd, MWA, DSI, Jeff, and Jody. (Doc. 1). A seventeen-count amended complaint (the "First Amended Complaint") was filed against all Defendants on May 4, 2010. (Doc. 104). Lloyd and

MWA filed a nine-count counterclaim against B & F (Doc. 105), and Jeff, Jody, and DSI filed their own counterclaim against B & F (Doc. 110).

B & F has now moved for summary judgment in its favor on fifteen of the counts contained in its First Amended Complaint, as well as all nine counterclaims asserted by Lloyd and MWA. Defendants have moved for summary judgment on all of the causes of action asserted by B & F, and Lloyd and MWA have moved for partial summary judgment on their first counterclaim.

## II.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party bears 'the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2549 (1986) (internal quotations omitted)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S.Ct. 2505 (1986).

The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249–50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). The court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted).

Finally, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538-39 (5th Cir. 2004).

## III.   CHOICE OF LAW

Many of the claims in this case arise out of the MIDA. That agreement contains a choice of law provision which reads: "It is the intention of the parties that the laws of Texas should govern the validity of this Agreement, and construction of its terms, and

the interpretation of the rights and duties of the parties, and all obligations of the parties created hereunder are performable in Dallas County, Texas." (Doc. 1-3, p. 6, ¶ 23C).

Notwithstanding this provision, the parties relied solely on Georgia law when arguing their summary judgment motions. Because of this apparent conflict, the Court ordered the parties to state in a brief containing case citations and authorities whether Texas law or Georgia law should apply to claims relating to the MIDA. The parties were also given the option of agreeing as to what state's law should apply, and if they so agreed, they were to inform the Court in writing as to that agreement.

In response to the Court's order, Defendants filed a four page brief filled with argument and legal citations outlining why Georgia law should be applied to the MIDA claims. B & F, on the other hand, filed a one sentence response stating that Georgia law applies. The Court agrees with Defendants that Georgia law should apply to the MIDA claims, and it has analyzed those claims under Georgia law.

## IV.    ANALYSIS

In analyzing the parties' arguments, the Court has discovered that some claims need to be taken out of order. Thus, the claims and counterclaims will not necessarily be addressed in the order presented in the First Amended Complaint and Defendants' answers.

### A.    B & F's Count V - Breach of Contract

B & F contends that Lloyd, Jeff, and Jody are all liable for breaching several provisions in the MIDA. These include Paragraphs 2, 3, 4, and E.

Before discussing the partnership issue B & F raises, the Court will address Paragraph 2, as resolution of the claims involving Paragraph 2 will be the same regardless of whether the paragraph is applied to Lloyd, Jeff, or Jody, or all three together.

Paragraph 2 states: "The MID agrees not to sell, handle or broker any product other than those products supplied by the Company whether competitive or noncompetitive with the Company's products. Sales on a non-repetative [sic] basis of personally owned items does not violate the noncompetitive part of this Agreement."[8] (Doc. 104, p. 39).

The Court finds that Paragraph 2 is an unenforceable restraint on trade. In Georgia, restrictive or noncompetition covenants must be reasonable as to time, territory, and scope to be enforceable. Atlanta Bread Co. Int'l, Inc. v. Lupton-Smith, 285 Ga. 587, 589, 679 S.E.2d 722, 724 (2009) (citing W.R. Grace & Co. v. Mouyal, 262 Ga. 464, 465, 422 S.E.2d 592 (1992)). The Georgia Supreme Court has held that an "in term" covenant like the one present in Paragraph 2 is subject to strict scrutiny for its reasonableness as to time, territory, and scope. Id. at 589. The Court disagrees with B & F's position that Paragraph 2 is an exclusivity provision, not a covenant not to compete. The cases cited by B & F, Buford-Clairmont Co., Ltd. v. RadioShack Corp.,

275 Ga. App. 802, 622 S.E.2d 14 (2005), and Market Place Shopping Ctr. v. Basic Business Alternatives, Inc., 213 Ga. App. 722, 445 S.E.2d 824 (1994), are distinguishable as those cases involved commercial business leases. The matter before the Court is more analogous to the situation in Atlanta Bread Co., which dealt with a franchise agreement. The MIDA is more nearly a franchise agreement than a commercial lease. Paragraph 2 does not contain a territorial limitation, which renders it unenforceable. *See* Atlanta Bread, 285 Ga. at 591; Atlanta Bread Co. Int'l, Inc. v. Lupton-Smith, 292 Ga. App. 14, 18, 663 S.E.2d 743, 747 (2008) ("A covenant not to compete must be limited as to territory or it will be invalidated.") While B & F contends that Paragraph 2 is limited to Tifton under Paragraph 5, that is not what the MIDA says. Paragraph 5 only provides that Tifton will be the city in which the warehouse and showroom will be located. It does not place any territorial restrictions on Paragraph 2. Thus, Defendants are entitled to summary judgment on Count V as to the alleged breach of Paragraph 2 of the MIDA.

But the unenforceability of Paragraph 2 does not render the remainder of the MIDA void. The MIDA contains a severability provision which states: "Should any one or more of the provisions hereof be determined to be illegal or unenforceable, all other provisions hereof shall be given effect separately therefrom and shall not be affected

---

[8] Paragraph 15 of the MIDA also contains a noncompetition agreement. All causes of action asserted by B & F related to Paragraph 15 were dismissed with prejudice by

thereby." (Doc. 104, p. 42, ¶ 23A). Under Georgia law, if a contract is severable, as the MIDA is, the remaining contract terms survive the void terms. *See* Capricorn Sys., Inc. v. Pednekar, 248 Ga. App. 424, 428, 546 S.E.2d 554, 558-59 (2001). Thus, the Court must consider B & F's breach of contract claims as to Paragraphs 3, 4, and E, but those claims cannot be decided until the partnership issue B & F raises is resolved. B & F's Motion for Summary Judgment as to Count V is denied. Defendants' Motion for Summary Judgment as to Count V is also denied except with respect to Paragraph 2.

### 1.   Partnership issue

As noted above, B & F contends Lloyd, Jeff, and Jody are liable for breaching Paragraphs 3, 4, and E of the MIDA.[9] B & F alleges that these three Defendants were

---

order of the Court on September 9, 2010. (Doc. 140).

[9]  Paragraph 3 states: "The MID agrees to furnish the lease on warehouse and office/showroom in Tifton, Georgia which is sufficient to store a 60-day supply of merchandise for sales in the assigned territory at no cost to the Company. MID also agrees to abide by and furnish such other fixtures, equipment, security and financial information as outlined in the Agreement."

Paragraph 4 states: "MID further agrees to cooperate with all of the Company's promotional programs, and to sell all of the Company's existing customers as well as making a continuing effort to establish new accounts and customers that will become part of The B & F System master customer list."

Paragraph E states: "The Company will supply printouts of master customer list for area, inventory status reports, and other such reports as available at no charge. The master customer list remains the property of The B & F System, Inc., and may not be sold, leased or given to any person or company for any purpose whatsoever."

(Doc. 104, pp. 39, 41-42).

in a partnership, which is "an association of two or more persons to carry on as co-owners a business for profit. . . ." O.C.G.A. § 14-8-6. Under Georgia law, partners are jointly liable for any wrongful acts and for any resulting liabilities. *See* O.C.G.A. §§ 14-8-13, 14-8-15. "Every partner is an agent of the partnership . . . , and the act of every partner, . . . binds the partnership. . . ." O.C.G.A. § 14-8-9. Further, notice to one partner of any matter relating to partnership affairs is notice to all of the partners. O.C.G.A. § 14-8-12; N. Peachtree I-285 Props., Ltd. v. Hicks, 136 Ga. App. 426, 431, 221 S.E.2d 607 (1975). According to B & F, because Lloyd, Jeff, and Jody were partners, they are all liable for breaching the MIDA. Defendants, not surprisingly, take the position that there was no partnership.

In Georgia, the issue of partnership "is generally a mixed question of law and fact, and cannot be resolved as a matter of law unless the verdict one way or the other is demanded by the evidence." Flatau v. Tribble's Shoes, Inc. (In re Lawrence), 82 B.R. 157, 161 (Bankr. M.D. Ga. 1988) (quoting Pope v. Triangle Chem. Co., 157 Ga. App. 386, 388, 277 S.E.2d 758 (1981)).

Upon review of the record, the Court finds that the partnership issue cannot be decided as a matter of law. A jury could find that Lloyd, Jeff, and Jody were in fact partners. A jury could also find that they were not partners. There is evidence in the record that the three men split profits from the Maxam businesses, and "[t]he receipt by a person of a share of the profits of a business is prima-facie evidence that he is a partner in the business." O.C.G.A. § 14-8-7. However, "no such inference shall be

24

drawn if profits were received in payment of . . . (B) wages, salary, or other compensation to an employee or independent contractor." Id. There is a question of fact as to whether the profits paid to Jeff and Jody were wages, salary, or other compensation to an employee. Therefore, the jury will have to decide whether there was a partnership between Lloyd, Jeff, and Jody. After resolving that question, the jury will then decide the breach of contract claim as to Paragraphs 3, 4, and E of the MIDA.

## B.    B & F's Count XIV - Breach of SMLA

B & F contends that Lloyd breached several provisions of the SMLA, specifically Paragraphs 1, 2, 3, 4, and 6, both prior to and after termination of the SMLA.[10]

───────────────────────

[10] Paragraph 1 of the SMLA states: "LICENSEE acknowledges that B & F has the sole and exclusive rights to use the mark 'MAXAM' as a service mark in connection with wholesale and retail sales services."

Paragraph 2 of the SMLA provides: "B & F hereby grants LICENSEE a royalty-free nonexclusive right and license cancellable at will, to use the service mark 'MAXAM' for retail and wholesale sales services, to use the mark 'MAXAM' as part of its business title, and to otherwise enjoy the goodwill associated with said mark.

"The nature of the services with which the service mark 'MAXAM' is to be used by LICENSEE shall have the approval of B & F in order to maintain the high standards of quality associated with the service mark 'MAXAM'. It is agreed by B & F that the present standards of services rendered by LICENSEE are satisfactory and LICENSEE agrees to maintain the present standards of quality of services rendered during the duration of the license herein granted.

Paragraph 3 of the SMLA states: "LICENSEE shall not in any manner represent that LICENSEE has any ownership in the mark licensed herein, any registration thereof, or any other mark incorporating the term 'MAXAM'; and acknowledges that LICENSEE's use of the mark shall not create in LICENSEE any right, title or interest in or to the

One question that must be decided is when the SMLA was terminated. Paragraph 6 provides that "[e]ither party hereto may terminate this license at any time by delivery of written notice of termination to the other party." (Doc. 104, p. 46). The notice provision, Paragraph 10, states:

> All notices required to be given or delivered under the terms of this agreement shall be deemed to have been delivered at the time when they are properly mailed. A notice is properly mailed when placed in an envelope and deposited in the United States mail, postage prepaid, the envelope being addressed as follows (or to such new address as may from time to time be sent by certified mail) to LICENSEE or to B & F:

---

licensed mark or any other mark incorporating the term 'MAXAM', other than the license herein granted."

Paragraph 4 of the SMLA provides: "LICENSEE agrees that it will exercise the right granted hereby in strict compliance with the limitations hereof and will comply with all instructions and limitations regarding use of the mark submitted to LICENSEE in writing by B & F. LICENSEE further agrees to permit B & F, through any duly authorized representative, to inspect LICENSEE's premises to determine compliance with the terms and conditions of the license herein granted.

Paragraph 6 of the SMLA provides: "Either party hereto may terminate this license at any time by delivery of written notice of termination to the other party. Upon termination of the license herein granted, LICENSEE shall immediately cease and desist from any further use of the mark 'MAXAM' or any colorable imitation thereof in any form and, if LICENSEE has included the term 'MAXAM' in its corporate name or title, LICENSEE shall immediately change such corporate name or title to delete therefrom the term 'MAXAM'.

(Doc. 104, pp. 45-46).

26

The B & F SYSTEM, INC.                    Lloyd LeBlanc/Maxam Wholesale of Ga

P.O. BOX 660036                           Rt. 1, Box 106-3l

DALLAS, TEXAS 75266-0036                  Tifton, Georgia 31794

(Doc. 104, pp. 46-47).

There is no dispute that written notice of termination was not properly mailed to Lloyd as required by Paragraphs 6 and 10 until November 12, 2007. B & F argues, however, that the SMLA was terminated on May 15, 2007 because Lloyd received actual notice of termination "via lengthy phone calls." B & F contends it substantially complied with the notice provisions by calling Lloyd, and further argues that Lloyd waived strict compliance with the notice provision by allowing and helping B & F load the remaining inventory and by shutting down Maxam Wholesale. Lloyd responds that a telephone call does not constitute substantial compliance with the notice provision.

"The provisions of a written contract may be waived by acts or conduct which justify the other party to believe the express provisions are waived." Hill Roofing Co., Inc. v. Lowe's Home Ctrs., Inc. 265 Ga. App. 822, 824, 595 S.E.2d 638, 641 (2004) (quoting Crawford v. First Nat. Bank of Rome, 137 Ga. App. 294, 295, 223 S.E.2d 488 (1976)). "[T]he question of whether the conduct of the parties causes a waiver of contract provisions, and a quasi new agreement effected, ordinarily, is a question of fact for a jury." Crawford, 137 Ga. App. at 295 (citations omitted). Here, a jury could find that Lloyd waived the written notice of termination requirement in the SMLA through his actions following the telephone call on May 15, 2007. "Courts will readily seize upon any

27

fact or circumstances growing out of the conduct of the parties, tending to show a waiver of strict compliance, and will seek to avoid the forfeiture and to leave the actual merits of the case open to investigation." Stimson v. George Laycock, Inc., 247 Ga. App. 1, 5, 542 S.E.2d 121 (2000) (citation omitted).

Both Defendants' and B & F's Motions for Summary Judgment on Count XIV are denied. The jury must determine when the SMLA was terminated, and then will determine if there was a breach of the SMLA.

### C.    Lloyd's & MWA's First Counterclaim - Wrongful Termination of Contract

In their First Counterclaim, Lloyd and MWA assert they are entitled to damages because B & F wrongfully terminated the MIDA. This counterclaim is based on the allegation that B & F never gave 90 days written notice of termination of the MIDA as required by Paragraph 9 of the MIDA. Paragraph 9 states:

> Unless otherwise mutually agreed, the termination of this Agreement may be made by the MID by giving ninety (90) days written notice to the Company. Unless mutually agreed, the termination of this Agreement may be made by the Company by giving no less than ninety (90) days written notice to the MID, but only if due cause can be shown for such termination.

(Doc. 104, p. 40).

B & F contends that it properly terminated the MIDA under Paragraph 19, which provides that "[f]ailure to comply with any of the agreements outlined herein will be grounds for immediate termination of this Agreement." (Doc. 104, p. 41). B & F argues

that because Defendants breached the MIDA, it was entitled to immediately terminate the MIDA under Paragraph 19, which requires no written notice. Thus, B & F argues, summary judgment in its favor on the First Counterclaim is appropriate.

The Court disagrees with B & F that Paragraph 19 renders the notice provision contained in Paragraph 9 a nullity. A violation of Paragraph 19 simply gives rise to the "due cause" for termination required under Paragraph 9 for B & F to terminate the MIDA. Summary judgment in B & F's favor on that ground is not appropriate.

B & F also argues that written notice was not required because the parties mutually agreed to terminate the MIDA. This argument merits further consideration. Under Paragraph 9, written notice is not required if the parties mutually agree to the termination. B & F contends that during the telephone conversations on May 15, 2007, the parties mutually agreed to terminate the MIDA. Defendants dispute that there was a mutual agreement to terminate the MIDA.

The Court has listened to the recordings and believes there is a jury question as to whether the MIDA was terminated by mutual agreement on May 15, 2007. Once that is determined, the jury will decide whether B & F wrongfully terminated the MIDA, if necessary.

### D.    B & F's Count VII - Inducing Breach

In Count VII of its First Amended Complaint, B & F alleges that Jeff, Jody, Edna, DSI, and PMDJ induced Lloyd to breach the MIDA.

To the extent Count VII is based on any alleged violation of Paragraph 2 of the MIDA, the count fails. As discussed above, Paragraph 2 is an unenforceable restraint on trade. Defendants cannot be held liable for inducing Lloyd to breach a void contract provision.

However, as also discussed above, because the MIDA contains a severability clause, the remainder of the MIDA is not void. Thus, B & F's inducing breach claim as to any other provisions of the MIDA survives.

With the exception of any claim based on Paragraph 2 of the MIDA, the Court cannot make a ruling on either summary judgment motion. Defendants argue that they cannot be held liable under an inducing breach theory because Lloyd did not breach the MIDA. But the breach of contract issue has yet to be decided, and cannot be decided until the partnership issue is resolved. Thus, both B & F's and Defendants' Motions for Summary Judgment are denied as to the inducing breach issue for the MIDA.

As for the SMLA, Defendants contend that they are entitled to summary judgment because Lloyd did not breach the SMLA, and because there is no evidence anyone other than Lloyd was aware of the SMLA.

Upon review of Count VII in the First Amended Complaint, it appears that B & F has not made a claim with respect to the SMLA. Count VII references only the "Agreement," which is the MIDA. There is no reference to the "License Agreement," which is the SMLA. The Court will not read a claim based on the SMLA into Count VII.

### E.   B & F's Count VIII - Tortious Interference

B & F has labeled Count VIII of its First Amended Complaint "tortious interference." B & F alleges that Edna, Jeff, Jody, PMDJ, and DSI have tortiously interfered "with the contractual relationship between Lloyd LeBlanc, Jr. and B & F and between B & F and its customers." Thus, it appears Count VIII is a tortious interference with contractual relations claim.

To establish a cause of action for wrongful interference with contractual relations, in addition to demonstrating the existence of a valid contract, a plaintiff must show that the defendant: (1) acted improperly and without privilege; (2) acted purposely and maliciously with the intent to injure; (3) induced a third party not to enter into or to continue a business relationship with the plaintiff; and (4) caused the plaintiff some financial injury. Quality Foods, Inc. v. Smithberg, 288 Ga. App. 47, 55-56, 653 S.E.2d 486 (2007) (quoting Carroll Anesthesia Assocs. v. AnestheCare, Inc., 234 Ga. App. 646, 647(1), 507 S.E.2d 829 (1998)).

One part of B & F's tortious interference claim is easily resolved. B & F contends Edna, Jeff, Jody, PMDJ, and DSI interfered with the contractual relationship between B & F and its customers. However, there is no evidence in the record of any contracts between B & F and its customers. In order to establish a contractual interference claim, B & F is required to establish the existence of a valid contract. *See, e.g.,* Wachovia Ins. Servs., Inc. v. Fallon, 299 Ga. App. 440, 449, 682 S.E.2d 657 (2009); Harris v. Distinctive Builders, Inc., 249 Ga. App. 686, 690(3), 549 S.E.2d 496 (2001) ("If there is

no contract, there can be no tortious interference with it.") While B & F may have had a business relationship with its customers, a contractual relationship that does not make. Edna, Jeff, Jody, DSI, and PMDJ are entitled to summary judgment on the tortious interference with contractual relations claim as to B & F and its customers. B & F's Motion for Summary Judgment on that issue is denied.

The tortious interference claim with regard to the contracts between Lloyd and B & F, the MIDA and SMLA, is a bit more complicated. Defendants first argue that they cannot be held liable for any tortious interference with Paragraph 2 of the MIDA because one cannot interfere with a void provision. The Court agrees. To the extent Count VIII as to Lloyd is based on Paragraph 2 of the MIDA, it fails, and Edna, Jeff, Jody, DSI, and PMDJ are entitled to summary judgment. B & F's Motion for Summary Judgment on that issue is denied.

As for the remainder of the MIDA, Edna, Jeff, Jody, DSI, and PMDJ argue that they cannot be held liable for tortious interference because they are not strangers to the contract. "[I]n order for a defendant to be liable for tortious interference with contractual relations, the defendant must be a stranger to both the contract and the business relationship giving rise to and underpinning the contract." Atlanta Mkt. Ctr. Mgmt. Co. v. McLane, 269 Ga. 604, 609(2), 503 S.E.2d 278 (1998). A person is not a stranger to the contract if the person would benefit economically from the relations at issue. Britt/Paulk Ins. Agency v. Vandroff Ins. Agency, 952 F.Supp. 1575, 1584 (N.D. Ga. 1996).

But there are some exceptions to the economic benefit rule. Georgia state decisions "have suggested that a corporate officer may be liable for interfering with the contract of the corporation if the officer disregarded the corporate entity or acted outside the scope of his agency or in derogation of the corporation." Parks v. Multimedia Techs., Inc., 239 Ga. App. 282, 292, 520 S.E.2d 517 (1999) (citations omitted). B & F argues that "Jeff, Jody, and Edna's interfering actions were in derogation of Lloyd d/b/a Maxam Wholesale of Atlanta, and their interfering actions were beyond the scope of their authority as agents for Maxam Wholesale of Atlanta." The problem with B & F's position is that Lloyd d/b/a Maxam Wholesale of Atlanta was not a corporation - it was a sole proprietorship. Edna, Jeff, and Jody could not be corporate officers because there was no corporation. The Parks case on which B & F relies specifically refers to a corporate officer disregarding the corporate entity or acting outside the scope of his agency or in derogation of the corporation. Id. Without a corporation, these exceptions cannot apply.

In any event, it is clear that Edna, Jeff, and Jody had a direct economic interest in the MIDA, and therefore are not strangers to the contract. See Atlanta Mkt. Ctr., 269 Ga. at 609 (citation omitted). This is especially true under B & F's theory that Jeff, Jody, and Lloyd were all partners, jointly liable, and jointly on notice about the various agreements. B & F cannot have it both ways. Certainly if Lloyd, Jeff, and Jody are partners, Jeff and Jody cannot be considered strangers to the MIDA. Further, B & F's own actions belie its position that Jeff and Jody were strangers to the contract, given

the fact that B & F tried to terminate the MIDA and SMLA at least partially through a telephone conversation with Jody. In addition, the record is replete with business correspondence between B & F and not only Lloyd, but also Jeff and Jody. The evidence shows that Jeff and Jody were in fact entangled with the contractual relationship underpinning B & F's and Lloyd's relations. As for Edna, common sense tells the Court that she had an economic interest in the MIDA, as she relied upon sales made under that agreement to support her. Thus, Edna, Jeff, and Jody are entitled to summary judgment on Count VIII. B & F's Motion for Summary Judgment as to those Defendants on Count VIII is denied.

B & F also contends that DSI and PMDJ interfered with the contract between Lloyd and B & F. Defendants argue that DSI and PMDJ could not have interfered because they were not reinstated or incorporated until after Lloyd and Edna committed to making the loan to Jeff and Jody to start their business. However, B & F's tortious interference claim does not appear to be a "one off" claim based solely on the initial August 2006 decision to loan money to Jeff and Jody. A contractual interference claim can be based on a breach of a contract or on hindering the performance of contractual duties. Perry Golf Course Dev., LLC v. Hous. Auth. of City of Atlanta, 294 Ga. App. 387, 397, 670 S.E.2d 171 (2008). The Court agrees with B & F that DSI and PMDJ are strangers to the MIDA. The fact that non-strangers are the shareholders of those corporations does not make the corporations non-strangers. Based on the evidence in the record, the Court believes it is for a jury to decide whether PMDJ tortiously

34

interfered with the contractual relationship between Lloyd and B & F as to the MIDA. Both B & F's Motion for Summary Judgment and Defendants' Motion for Summary Judgment on this issue are denied.

DSI, however, is a bit different, because it was not incorporated until May 25, 2007, which is after the date B & F contends the MIDA was terminated. If there is no contractual relationship between B & F and Lloyd, there cannot be any interference. As previously noted, it is a question of fact as to when the MIDA was terminated. If the jury finds the MIDA was terminated on May 15, 2007, DSI will be entitled to judgment in its favor. If the jury finds the MIDA was not terminated on May 15, then DSI could possibly be liable for tortious interference from the time of its incorporation to the date the MIDA was terminated, whenever that might be. At this time, the tortious interference issue as to DSI cannot be resolved, and both B & F's and Defendants' Motions for Summary Judgment on this issue are denied.

As for the SMLA, Edna, Jeff, Jody, DSI, and PMDJ argue that they cannot be held liable for tortious interference with the SMLA because there is no evidence any of them were ever aware of the SMLA. If the jury finds that Jeff and Jody were part of a partnership with Lloyd, knowledge of the SMLA will be imputed to them. Therefore, the tortious interference claim as to Jeff and Jody on the SMLA cannot be decided, and neither party is entitled to summary judgment.

With regard to Edna, there is no evidence in the record that speaks to whether she knew about the SMLA or not. The case cited by Defendants to support their

position that one cannot interfere with a contract of which he is unaware, <u>Medlin v. Morgenstern</u>, 268 Ga. App. 116, 119, 601 S.E.2d 359 (2004), can be distinguished because in <u>Medlin</u> there was affidavit evidence in the record from the defendants establishing that they were not aware of the contract. *See also* <u>Tom's Amusement Co., Inc. v. Total Vending Servs.</u>, 243 Ga. App. 294, 298, 533 S.E.2d 413 (2000) (physical precedent only) (evidence was undisputed that the defendant was not aware of a noncompete agreement, so there could not be any tortious interference). Here, Defendants have provided no evidence that Edna was not aware of the SMLA, but on the other hand, B & F has provided no evidence that she did know about the SMLA. While the Court would be hard pressed to believe Edna was unaware of the SMLA, that is not for the Court to decide. The jury must resolve that issue. Only if the jury finds that Edna was aware of the SMLA will the tortious interference claim come into play. Thus, summary judgment is denied for all parties on this issue.

That leaves DSI and PMDJ. Under Georgia law, "knowledge of officers of a corporation is knowledge to that corporation and the corporation is bound thereby." <u>Stein Steel & Supply Co. v. Franco</u>, 148 Ga. App. 186, 188, 251 S.E.2d 74 (1978). If it is determined that Jeff and Jody, both officers of DSI and PMDJ, had knowledge of the SMLA, that knowledge would be imputed to the corporations. Like many issues in this case, this question cannot be answered until underlying issues regarding Jeff and Jody are resolved. Summary judgment is denied for all parties on this issue.

**F.    B & F's Count IX - Tortious Interference with Prospective Business Relations**

While B & F labels Count IX a tortious interference with prospective business relations claim, it is actually both an interference with business relations and interference with prospective business relations claim, which are separate causes of action. B & F alleges that Edna, Jeff, Jody, DSI, PMDJ, LeBlanc's, and Lloyd interfered with both actual and prospective business relations between B & F and its customers.

To support a tortious interference with business relations or prospective business relations claim, the plaintiff must show: (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant caused a party to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff. Gordon Document Prods., Inc. v. Serv. Techs., Inc., 308 Ga. App. 445, 449, 708 S.E.2d 48 (2011).

The problem with B & F's claim is element three of the tortious interference test - that the defendant caused a party to discontinue or fail to enter into an anticipated business relationship with the plaintiff. B & F has not provided any evidence establishing that a current customer stopped doing business with B & F because of Defendants' actions, or that a potential customer decided not to enter into a business relationship with B & F because of Defendants' actions. While B & F has provided affidavits from Cupid Gainous and Richard Coristine, both of whom were, and perhaps

still are, customers of B & F and were allegedly told by Defendants' employees that B & F was out of business, neither affiant states that Defendants' actions caused them to discontinue their business relationships with B & F. And while B & F points to testimony that Defendants' employees told customers who called the Tifton warehouse that DSI would be glad to sell to them, there is no evidence DSI actually sold anything to B & F's customers, that those people stopped making purchases from B & F, or that they decided not to make a purchase from B & F because of what Defendants' employees said. Without some evidence that customers or potential customers decided to forego their business relationships with B & F because of Defendants' conduct, the tortious interference claim in Count IX cannot stand. *See* Vito v. Inman, 286 Ga. App. 646, 649, 649 S.E.2d 753 (2007) (summary judgment for the defendant was proper when the plaintiff failed to point to evidence that patients discontinued their relationship with the plaintiff because of the defendant's statements); Jenkins v. Gen. Hosp. of Humana, Inc., 196 Ga. App. 150, 151, 395 S.E.2d 396 (1990) (tortious interference with business relations claim failed when the plaintiff doctor was unable to name a single patient he lost or failed to acquire due to the defendants' actions).

Defendants are entitled to summary judgment in their favor on Count IX. B & F's Motion for Summary Judgment on that count is denied.

### G.    B & F's Count I - Infringement of Federally Registered Marks - 15 U.S.C. § 1114

B & F contends Defendants used its registered trademarks "MAXAM USA" and "MAXAM" (the "Marks") without authorization, and that wrongful use infringed Plaintiff's rights in the Marks, in violation of Section 32(a) of the Lanham Act, 15 U.S.C. § 1114. Section 32(a) creates a cause of action for the infringement of a registered mark, and provides as follows:

> 1.    Any person who shall, without the consent of the registrant -
>
> a.    use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . .
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1)(a).

In order to prevail on a trademark infringement claim based on a federally registered trademark, B & F must establish: (1) that it possesses a valid mark; (2) that Defendants used the mark; (3) that Defendants' use of the mark occurred "in commerce"; (4) that Defendants used the mark "in connection with the sale . . . or advertising of any goods"; and (5) that Defendants used the mark in a manner likely to confuse customers. N. Am. Med. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1218 (11th Cir. 2008) (citations omitted).

39

However, "where the trademark holder has authorized another to use its mark, there can be no likelihood of confusion and no violation of the Lanham Act if the alleged infringer uses the mark as authorized." Segal v. Geisha NYC LLC, 517 F.3d 501, 506 (7th Cir. 2008); Sound Surgical Techs., LLC v. Leonard A. Rubenstein, M.D., P.A., 734 F.Supp.2d 1262, 1270 (M.D. Fla. 2010). As the Eleventh Circuit stated in McDonald's Corp. v. Robertson, "in order to prevail on a trademark infringement claim, a plaintiff must show that its mark was used in commerce by the defendant without the registrant's consent and that the unauthorized use was likely to deceive, cause confusion, or result in a mistake." 147 F.3d 1301, 1307 (11th Cir. 1998).

Here, the right to use the Marks arose from the SMLA. That agreement granted Lloyd a nonexclusive right and license to use the Marks. Of course, once the license ends, the licensee no longer has the right to use the mark, and any further use is unauthorized. See U.S. Structures, Inc. v. J.P. Structures, Inc., 130 F.3d 1185, 1190-92 (6th Cir. 1997) (holding that "proof of continued, unauthorized use of an original trademark by one whose license to use the trademark has been terminated is sufficient to establish 'likelihood of confusion'"); Burger King Corp. v. Mason, 710 F.2d 1480, 1492 (11th Cir. 1983) (holding that a trademark infringement claim was established if the trademarks were used in a manner likely to cause confusion or deceive because the defendant used the trademarks after the revocation of that right without the plaintiff's consent).

While the general rule is pretty clear, the waters are muddied in this case because there is a dispute over when the SMLA was terminated. B & F claims it was terminated on May 15, 2007, making any use of the Marks after that date unauthorized. Defendants, on the other hand, contend the SMLA was not terminated until November 12, 2007. As addressed *supra*, the SMLA termination date is a question for the jury. Until that issue is decided, the claim for unauthorized use cannot be resolved. Once the termination date is established, the infringement claim will go before the jury. B & F's and Defendants' Motions for Summary Judgment on Count I are denied.

### H.    B & F's Count II - False Designation of Origin, Unfair Competition, and False Advertisement under Federal Lanham Act - 15 U.S.C. § 1125(a)

B & F presents three claims in Count II - trade dress infringement, false advertising, and false designation of origin/unfair competition, all of which arise out of Section 43(a) of the Lanham Act. That section creates a federal cause of action against anyone who:

> . . . on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which - -
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

15 U.S.C. § 1125(a)(1)(A)-(B).

### 1.    Trade dress infringement

Section 43(a) creates a cause of action for trade dress infringement. Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC, 369 F.3d 1197, 1202 (11th Cir. 2004). "The term 'trade dress' refers to the appearance of a product when that appearance is used to identify the producer." Id. (quoting Publ'n Int'l, Ltd. v. Landoll, Inc., 164 F.3d 337, 338 (7th Cir. 1998)). " 'Trade [d]ress' involves the total image of a product and may include features such as size, shape, color, . . ., texture, graphics, or even particular sales techniques." Id. (quoting AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1535 (11th Cir. 1986)). The design of a product itself may constitute protectable trade dress, and a feature of a product may be protectable trade dress too. Epic Metals Corp. v. Souliere, 99 F.3d 1034, 1038 (11th Cir. 1996). To prevail on a trade dress infringement claim, a plaintiff must prove: "(1) the product design of the two products is confusingly similar; (2) the features of the product design are primarily non-functional; and (3) the product design is inherently distinctive or has acquired secondary meaning." Dippin' Dots, 369 F.3d at 1202 (citing Epic Metals, 99 F.3d at 1038). "[A]s all three elements are necessary for a finding of trade dress infringement, any one could be characterized as threshold." Epic Metals, 99 F.3d at 1039. It is B & F's burden, even on summary

judgment, to establish all three prongs of the test. *See* <u>Dippin' Dots</u>, 369 F.3d at 1202 n. 5.

B & F alleges trade dress infringement in the following items:

1.      Items containing the grey leather tag as shown on Plaintiff's Exhibits 97, 98, 99, and 100;

2.      Plaintiff's Exhibit 112 or items confusingly similar to Plaintiff's Exhibit 113, also known as Item CTDC 19;

3.      Plaintiff's Exhibit 108 or items confusingly similar to Plaintiff's Exhibit 109, also known as Item CTS217;

4.      Any steam control knob confusingly similar to the steam control knob as shown on Plaintiff's Exhibit 117, including but not limited to Plaintiff's Exhibit 17;

5.      Plaintiff's Exhibit 19 or any items confusingly similar to Plaintiff's Exhibit 105, also known as GFVBIKE;

6.      Plaintiff's Exhibit 17 or ay items containing a bottom stamp confusingly similar to the bottom stamp on Plaintiff's Exhibit 117;

7.      Plaintiff's Exhibit 107 or any items confusingly similar to Plaintiff's Exhibit 106, also known as Item LULGYM;

8.      Plaintiff's Exhibit 20 or any items confusingly similar to Plaintiff's Exhibit 205, also known as Item LUMSET; and

9.      Plaintiff's Exhibit 101 or any items confusingly similar to Plaintiff's Exhibit 204, also known as Item LUPHRT.

(Doc. 170, p. 40).

"If the plaintiff's trade dress is not sufficiently distinctive to allow customers to identify the product from the trade dress, then the dress does not inherently serve as an indication of origin and the plaintiff can claim no right to the exclusive use of the trade dress." Univ. of Fla. v. KPB, Inc., 89 F.3d 773, 777 n. 5 (11th Cir. 1996) (citing AmBrit, 812 F.2d at 1536). To determine if trade dress is inherently distinctive, the court should consider whether the trade dress is: (1) a common, basic shape or design; (2) unique or unusual in a particular field; and (3) a mere refinement of a commonly adapted and well known form of ornamentation for a particular class of goods which consumers view as mere ornamentation. Id. (quotation omitted). To put it another way, trade dress is inherently distinctive if "the design, shape or combination of elements is so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indication of origin." 1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 8:13 (4th ed. 2010).

B & F has not shown that its trade dress is inherently distinctive. In its response to Defendants' Motion for Summary Judgment, B & F does not even bother trying to establish inherent distinctiveness.[11] Instead, it merely makes the conclusory statements that "its MAXAM marks and trade dress are inherently distinctive" (Doc. 170, p. 41) and "trade dress is inherently distinctive." (Doc. 170, p. 43). Such conclusions are not

---

[11] B & F does not substantively address the trade dress claim at all in its own summary judgment motion.

sufficient to show inherent distinctiveness. After all, it is B & F's burden to establish all three prongs of the trade infringement test. For example, B & F has presented no argument or evidence as to why the trade dress for items containing the grey leather tag as shown on Plaintiff's Exhibits 97, 98, 99, and 100 is inherently distinctive, other than just stating that it is so. It is not the Court's responsibility to guess as to how B & F's trade dress is inherently distinctive, and the Court will not do so here.

Alternatively, a plaintiff may show that its trade dress has acquired secondary meaning. Univ. of Fla., 89 F.3d at 777 n. 5. Secondary meaning is "the connection in the consumer's mind between the mark and the product's producer, whether that producer is known or unknown." AmBrit, 812 F.2d at 1536 n. 14. Again, B & F has not presented evidence showing that the trade dress for all of the goods listed has acquired secondary meaning. Instead, B & F just states in conclusory form that "B & F's trade dress and MAXAM marks have acquired secondary meaning. The society of wholesale buyers that B & F has developed over the last 58 years recognize B & F products and value them because of their association with B & F. Similar products may be available from others, but B & F's unique designs and trade dress bring independent value to MAXAM products." (Doc. 170, p. 44). This is merely argument from B & F's attorney with no evidence to support the assertions.

The only evidence B & F has presented with regard to secondary meaning relates to the cookware lid knob. It has made no effort to establish that the trade dress of any of the identified products aside from the lid knob have acquired any secondary

45

meaning in the marketplace, so the Court will only address the lid knob. B & F has provided three customer affidavits which all state that the lid knob "is effective to cause the purchasing public to identify the knob with its source, namely B & F." (Pl.'s Exs. 203, 206, 245). However, in the Court's opinion, three affidavits simply are not sufficient to establish that the lid knobs have acquired a secondary meaning in the marketplace. The most persuasive evidence for establishing secondary meaning is survey evidence. *See* Gen. Motors Corp. v. Lanard Toys, Inc., 468 F.3d 405, 419 (6th Cir. 2006); Sugar Busters LLC v. Brennan, 177 F.3d 258, 269 (5th Cir. 1999). B & F has not presented any survey evidence in this case. "[I]n the absence of survey evidence, a plaintiff must have other compelling evidence proving secondary meaning." Vital Pharms., Inc. v. Am. Body Bldg. Prods., LLC, 510 F.Supp.2d 1043, 1049 n. 4 (S.D. Fla. 2007). B & F has not offered other compelling evidence proving secondary meaning. While B & F contends it has spent millions of dollars on advertising over the past ten years, "[s]imply offering evidence of extensive advertising is inadequate to prove secondary meaning, as the dispositive factor is the effectiveness of that advertising." Id. at 1049. Other than presenting three affidavits relating to only one item, which affidavits do not relate directly to B & F's advertising efforts, B & F has not offered any evidence showing the effectiveness of its advertising on the minds of consumers.

As B & F has not shown its trade dress to be inherently distinctive or to have acquired secondary meaning, the trade dress infringement claim fails. Defendants' Motion for Summary Judgment as to the trade dress claim in Count II of the First

Amended Complaint is granted. B & F's Motion for Summary Judgment on that issue is denied.

### 2.   False advertising

To prevail on a false advertising claim under the Lanham Act, a plaintiff must establish: (1) the ads of the opposing party were false or misleading; (2) the ads deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been - or is likely to be - injured as a result of the false advertising. Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1247 (11th Cir. 2002).

If an advertisement is deemed to be literally false, the movant is not required to present evidence of consumer deception. Id. at 1247. Even assuming the advertisements with which B & F takes issue are literally false,[12] thus relieving B & F of the burden of showing consumer confusion, B & F's false advertising claim fails because B & F has not shown that the deception had a material effect on purchasing decisions. "The plaintiff must establish materiality even when the court finds that the defendant's advertisement is literally false." Id. at 1250 (citations omitted). The Eleventh Circuit in Johnson & Johnson clearly established that materiality must be shown even if

---

[12] The Court makes this assumption only for the sake of argument. In no way is the Court finding as a matter of law that any of the advertisements were literally false.

the advertisements are literally false. Consumer confusion and materiality are separate elements not to be conflated. In reference to materiality, B & F merely states that "Defendants' advertisements had, or likely had, an effect on consumers' purchasing decisions. Continued web traffic on www.maxamwholesale.com and www.maxamwholesale.com [sic] as well as Defendants' sales of similar items to B & F's customers establishes this." (Doc. 170, p. 39). The Court finds that materiality has not been shown. B & F has not demonstrated that any of Defendants' allegedly deceptive advertisements impacted the decision of any customers to purchase goods from Defendants rather than from B & F. B & F wants the Court to assume that any customers who may have purchased goods from Defendants must have done so because of the advertisements. The Court declines to make that assumption. Defendants are entitled to summary judgment on the false advertising claim set forth in Count II of the First Amended Complaint. B & F's Motion for Summary Judgment on the false advertising claim is denied.[13]

---

[13] In Count IV of its Amended Complaint, B & F brings a state law false advertising claim pursuant to O.C.G.A. § 10-1-421. A claim under that statute is evaluated under essentially the same standards as a Lanham Act false advertising claim. *See* Corrpro Cos., Inc. v. Meier, No. 3:03-CV-31 (CDL), 2007 WL 2320625, * 3 n. 3. As the Court has determined that Defendants are entitled to summary judgment in their favor on the federal false advertising claim, they are entitled to summary judgment on the state false advertising claim as well. B & F's Motion for Summary Judgment as to the state false advertising claim is denied.

### 3.    False designation of origin/unfair competition

Plaintiff's last claim in Count II of its First Amended Complaint is a false designation of origin/unfair competition claim based on § 43(a)(1)(A) of the Lanham Act. Likelihood of confusion is an essential element to a claim under § 43(a)(1)(A). *See* Atlanta Allergy and Asthma Clinic, P.A. v. Allergy & Asthma of Atlanta, LLC, 685 F.Supp.2d 1360, 1376 (N.D. Ga. 2010) ("The ultimate question, for purposes of determining liability in trademark infringement actions, in whether there is a likelihood that consumers will be confused about the relationship or affiliation between the plaintiff's products or services and the defendant's products or services.") For purposes of § 43(a), likelihood of confusion is determined by an analysis of a number of factors, including:

> (1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and the allegedly infringing mark; (3) the similarity between the products and services offered by the plaintiff and defendant; (4) the similarity of the sales methods, i.e., retail outlets or customers; (5) the similarity of advertising methods; (6) the defendant's intent, e.g., does the defendant hope to gain competitive advantage by associating his product with the plaintiff's established mark; and (7) the most persuasive factor on likely confusion is proof of actual confusion.

Conagra, Inc. v. Singleton, 743 F.2d 1508, 1514 (11th Cir. 1984).

Neither party has addressed the likelihood of confusion factors. In any event, "likelihood of confusion is typically a question of fact." Xtreme Lashes, LLC v. Xtended Beauty, Inc., 576 F.3d 221, 226 (5th Cir. 2009). In the absence of any analysis on the

part of the parties as to likelihood of confusion, the Court will allow the parties to make their arguments to the jury on the § 43(a)(1)(A) claims. Plaintiff's Motion for Summary Judgment and Defendants' Motion for Summary Judgment are both denied on this issue.[14]

I.      B & F's Count III - Cyberpiracy - 15 U.S.C. § 1125(d)

In Count III of its First Amended Complaint, B & F alleges that Defendants' registration and use of the domain names maxamwholesale.com and maxamwholesale.net constitute cyberpiracy in violation of the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d).

The ACPA provides:

> (1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person

---

[14] B & F's Georgia Uniform Deceptive Trade Practices Act ("GUDTPA") claim under O.C.G.A. § 10-1-372 in Count IV is co-extensive with the § 43(a)(1)(A) Lanham Act analysis. *See* Step Co. v. Consumer Direct, Inc., 936 F.Supp. 960, 967 (N.D. Ga. 1994) (citing Jellibeans, Inc. v. Skating Clubs of Ga., Inc., 716 F.2d 833, 839 (11th Cir. 1983)). For both claims, a likelihood of confusion must be shown. As the Court finds that the jury must decide the false designation of origin/unfair competition claim, the GUDTPA claim survives as well and will be addressed by the jury.

The issue of the MIDA and SMLA termination comes into play here as well. It appears some of B & F's claims are based on actions that occurred after May 15, 2007, which is when B & F contends the MIDA and SMLA were terminated, but before November 12, 2007, which is when Defendants contend the SMLA was terminated. Defendants contend the MIDA was never properly terminated.

(i)      has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

(ii)      registers, traffics in, or uses a domain name that - -

(I)      in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

(II)      in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

(III)      is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

15 U.S.C. § 1125(d).

The ACPA provides a cause of action for a trademark owner against a person who "has a bad faith intent to profit from [the owner's] mark" and who "registers, traffics in, or uses a domain name" that is identical or confusingly similar to the owner's distinctive mark. 15 U.S.C. § 1125(d)(1)(A)(i)-(ii); S. Grouts & Mortars, Inc. v. 3M Co., 575 F.3d 1235, 1243-44 (11th Cir. 2009). The ACPA provides a list of nine non-exclusive factors a court may consider when determining if a defendant had a bad

faith intent to profit. 15 U.S.C. § 1125(d)(1)(B)(I).[15] The Eleventh Circuit in <u>Southern Grouts</u> confirmed that consideration of these nine factors is permissive. 575 F.3d at

---

[15] The nine factors a court may consider in determining whether a person had a bad faith intent to profit include but are not limited to:

(I)      the trademark or other intellectual property rights of the person, if any, in the domain name;

(II)      the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III)      the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV)      the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V)      the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI)      the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII)      the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII)    the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

1244. *See also* Virtual Works, Inc. v. Volkswagen of Am., Inc., 238 F.3d 264, 269 (4th Cir. 2001) ("We need not, however, march through the nine factors seriatim because the ACPA itself notes that use of the listed criteria is permissive.")

Before discussing the merits of Plaintiff's claim, one issue must be addressed. The ACPA was enacted on November 29, 1999. Jeff registered the domain name maxamwholesale.com on May 11, 1999, six months before the ACPA went into effect. Under the ACPA and portions of 15 U.S.C. § 1117, which addresses the damages recoverable for a violation of § 1125(d), damages "shall not be available with respect to the registration, trafficking, or use of the domain name that occurs before the date of the enactment of this Act [November 29, 1999]." 1999 Acts, P.L. 106-113, § 3010, 113 Stat. 1536. A number of courts, however, have found that a defendant can still be liable for statutory damages for a violation of § 1125(d) even if the domain name was registered prior to the enactment of the ACPA if the defendant continued to use the violating domain name after November 29, 1999. *See* Ford Motor Co. v. Catalanotte, 342 F.3d 543, 547-48 (6th Cir. 2003); E. & J. Gallo Winery v. Spider Webs Ltd., 286 F.3d 270, 275 n. 2 (5th Cir. 2002); Shields v. Zuccarini, 254 F.3d 476, 486-87 (3d Cir.

---

(IX)   the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B)(I).

2001). Thus, Defendants could be held liable for the use of maxamwholesale.com after November 29, 1999.[16]

Another consideration is who may be held liable under the ACPA. The statute provides that liability for "using" a domain name arises "only if [a] person is the domain name registrant or that registrant's authorized licensee." 15 U.S.C. § 1125(d)(1)(D). It is undisputed that Jeff was the registrant for both maxamwholesale.com and maxamwholesale.net. Thus, he is the only Defendant that can be held liable for using the domain names.[17] *See* Bird v. Parsons, 289 F.3d 865, 881 (6th Cir. 2002) (noting that liability for using a domain name can only exist for the registrant or that person's authorized licensee).

Similarly, as he is the only registrant, Jeff alone can be held liable for registering the domain names, and in fact, Jeff could only be held liable for registering maxamwholesale.net since maxamwholesale.com was registered prior to the enactment of the ACPA.

There is a separate cause of action available under 15 U.S.C. § 1125(d) for trafficking in a domain name that is identical or confusingly similar to a distinctive mark. 15 U.S.C. § 1125(d)(1)(A)(ii). However, a review of the First Amended Complaint shows

---

[16] The domain name maxamwholesale.net was registered on February 15, 2005, which brings it square within the ACPA.

[17] There is no evidence that any other Defendant was Jeff's authorized licensee.

that Plaintiff has not made a trafficking claim.[18] Plaintiff only alleges that Defendants improperly used or registered the domain names. Thus, the Court will only consider registration and use.

Now the Court will move on to the merits of Count III. When Jeff registered the domain names maxamwholesale.com and maxamwholesale.net, the MIDA and SMLA were in full effect. Jeff set up websites using these domain names so customers could purchase items over the internet. For years everyone involved made a great deal of money off of the maxamwholesale websites. Then the relationship between B & F and the LeBlancs fell apart, leading to the end of the business relationship between the parties. At that time, however, Jeff was still in control of the two domain names, and remained in control of the domain names until June of 2011.

The ACPA contains a safe harbor fair use defense. Under this provision, "[b]ad faith intent . . . shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). Defendants argue that registering maxamwholesale.net[19] and using maxamwholesale.com and

---

[18] The Court further notes that there is no mention of a trafficking claim in B & F's memorandum of law in support of its Motion for Summary Judgment.

[19] Recall that maxamwholesale.com was registered before the enactment of the ACPA.

maxamwholesale.net fall under the safe harbor provision, at least until the termination of the SMLA and MIDA.

The Court agrees with Defendants that use of the MAXAM mark while the SMLA and MIDA were in effect falls under the safe harbor provision. Certainly Jeff had reasonable grounds to believe that the registration of maxamwholesale.net and the use of maxamwholesale.com and maxamwholesale.net were lawful. Nothing in the record suggests that Plaintiff objected to the registration of the domain name maxamwholesale.net or to the use of the domain names until the MIDA and SMLA until the time Plaintiff contends it terminated the agreements. Unfortunately, there are unresolved questions as to when the MIDA and SMLA were terminated. Thus, the Court cannot determine the point where any liability would begin, if in fact Jeff is liable under the ACPA. At this time, Defendants' Motion for Summary Judgment and Plaintiff's Motion for Summary Judgment on Count III are both denied.

### J.    B & F's Count XIII - Misappropriation of Trade Secrets under Georgia Trade Secrets Act of 1990

B & F contends that its customer list is a trade secret, and alleges that Defendants misappropriated the list in violation of the Georgia Trade Secrets Act ("GTSA"), O.C.G.A. § 10-1-760, *et seq.*

"To be protected as a trade secret, a customer list must (1) derive economic value from being a secret not readily ascertainable by proper means, and (2) be the subject of reasonable efforts to maintain its secrecy." Vito, 286 Ga. App. at 649-50(2).

56

For a customer list to be entitled to protection under the GTSA, a plaintiff must establish both prongs of the trade secret test. Id. (citing Bacon v. Volvo Serv. Ctr., 266 Ga. App. 543, 544(1), 597 S.E.2d 440 (2004)).

The question here is whether reasonable efforts were made to keep the customer list and associated customer information secret. Defendants argue that B & F took no precautions to maintain the confidentiality of the customer list or the customer information. The customer list was on the computer server at the Tifton warehouse, was not password protected, and was available to anyone who worked at the warehouse. Further, the customer information was voluntarily disclosed by B & F to Lloyd and Jody in the form of electronic files attached to emails, none of which were protected, restricted, or limited in any way.

B & F responds that reasonable efforts to maintain the secrecy of the customer list were made. B & F points to the MIDA, which states that B & F retains ownership of the customer list. Under the MIDA, Lloyd agreed not to sell, lease, or give the customer list to anyone. In addition, B & F adopted a confidentiality provision in its employee handbook, and employees are required to acknowledge receipt of the policy. Relying on Diamond Power International, Inc. v. Davidson, 540 F.Supp.2d 1322 (N.D. Ga. 2007), B & F argues that disclosing the customer information to the LeBlancs did not destroy the trade secret protection because B & F and the LeBlancs had a confidential business relationship. Id. at 1333.

57

Defendants state in reply that the MIDA never mentions the words "confidential," "proprietary," "trade secret," or any similar designation as to the customer list. Defendants also argue that the employee confidentiality statement is irrelevant because the LeBlancs were not employees, they never signed the reference confidentiality agreement, and B & F admitted that those agreements were not applicable to the LeBlancs.

Assuming arguendo that B & F had a confidential business relationship with the LeBlancs such that any trade secret protection would not be destroyed by disclosure of the customer list to the LeBlancs, that is not the end of the inquiry. "Even in such a case, however, the plaintiff must demonstrate that it has taken reasonable efforts to maintain its secrecy by not widely distributing the information to its employees without proper controls." Id. at 1333 (citations omitted).

Section 6 of B & F's employee handbook contains a section called "Use of Company Assets." It states that customer lists and files are property of the company and must not be sold or given away, among other things. B & F states in its response to Defendants' summary judgment motion that B & F followed through with the confidentiality requirements by requiring employees to sign acknowledging receipt of the policy. But the exhibit referenced by B & F to support that statement, Plaintiff's Exhibit 350, is not signed by an employee, and further, the attached document makes no mention of the customer lists. There is a general reference to the company's "trade secrets," but no specific reference to the customer list.

58

As for the MIDA signed by Lloyd, it does state that the customer list belongs to B & F, and that it may not be sold, leased, or given to anyone else. Nowhere in the MIDA, however, is the customer list referred to as confidential.

A review of the evidence also shows that on multiple occasions, B & F sent customer lists and information to Jody and Lloyd by email. The emails contain no disclaimer about the confidentiality of the materials attached.

Essentially, the only thing B & F has done to maintain the secrecy of its customer list and information is to include a confidentiality provision in its employee handbook and include a clause about the customer list in the MIDA. Georgia law is well established that requiring employees "to sign a general confidentiality agreement upon the commencement of their employment does not alone demonstrate that [the employer's] efforts to maintain secrecy were reasonable." Diamond Power, 540 F.Supp.2d at 1332 (citing Equifax Servs., Inc. v. Examination Mgmt. Servs., Inc., 216 Ga. App. 35, 453 S.E.2d 488 (1994) and AmeriGas Propane, L.P. v. T-Bo Propane, 972 F.Supp. 685, 701 (S.D. Ga. 1997)).

The Court finds that the customer list is not a trade secret. B & F did not make reasonable efforts to maintain its secrecy. Other than a 20-year old MIDA and a confidentiality provision located on pages 34 and 35 of the employee handbook, B & F has done nothing to protect its customer list. The information was freely emailed between B & F's staff and the LeBlancs with no password protection or even a confidentiality notice on the emails. The emails were not sent through a secure internal

mail system either. There is no evidence that after the MIDA was signed in 1986 that B & F even told the LeBlancs that the list was to be considered confidential or a trade secret. Further, none of the pages of the customer list are marked confidential. There is no evidence that the list was located on a secure network, and in fact, the evidence shows that anyone at the Tifton warehouse could access the information. Finally, B & F was well aware that Jeff and Jody were working with Lloyd and had access to the customer list, but B & F never required either of them to sign a confidentiality agreement.

Under the record before it, the Court finds that the customer list does not rise to the level of a trade secret. Defendants are entitled to summary judgment in their favor on Count XIII. B & F's Motion on this count is denied.[20]

### K.    B & F's Count VI - Conversion

B & F contends in Count VI that Defendants converted B & F's master customer list. In order to establish a claim for conversion, "the complaining party must show (1) title to the property or the right of possession, (2) actual possession in the other party, (3) demand for return of the property, and (4) refusal by the other party to return the property." Metzger v. Americredit Fin. Servs., Inc., 273 Ga. App. 453, 454, 615 S.E. 2d

---

[20] Defendants also argue that the GTSA cannot apply in this case because it was not enacted until 1990, and the MIDA was signed in 1986. In light of the Court's ruling in Defendants' favor on this claim, the Court does not believe it necessary to analyze the retroactivity issue.

120 (2005) (quoting Johnson v. First Union Nat. Bank, 255 Ga. App. 819, 823(4), 567 S.E.2d 44 (2002) (citation omitted)). Defendants argue, among other things, that the conversion claim is preempted by the GTSA.

The GTSA "supersede[s] conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." O.C.G.A. § 10-1-767(a). It does not affect "[o]ther civil remedies that are not based upon a misappropriation of a trade secret." O.C.G.A. § 10-1-767(b). This area of preemption is far from established. As the Eleventh Circuit noted in Penalty Kick Management Ltd. v. Coca Cola Co., "Georgia courts have not specifically defined what constitutes a conflict between the GTSA and the common law." 318 F.3d 1284, 1297 n. 11 (11th Cir. 2003).

Plaintiff argues that its conversion claim is not preempted by the GTSA. In its response to Defendants' Motion for Summary Judgment, Plaintiff has attempted to recast its conversion claim to one for conversion of tangible property. Plaintiff states that Defendants "converted Plaintiff's client files, PIC system data, and the master customer list." However, even assuming Defendants had tangible copies of the customer list and information (i.e., a hard copy of the list or a copy of the list downloaded onto a disk), "this tangible property has little value apart from the information contained therein." Opteum Fin. Servs., LLC v. Spain, 406 F.Supp.2d 1378, 1381 (N.D. Ga. 2005).

The Court has already determined that the customer list is not a trade secret, but courts have found preemption even when the information constituted a trade secret. In

Penalty Kick, the Eleventh Circuit found that the information at issue rose to the level of a trade secret and held that the plaintiff's claim for conversion was superseded by the GTSA. 318 F.3d at 1297-98. And in a case where the plaintiff admitted its information did not rise to the level of a trade secret, the Northern District of Georgia still found that the conversion claim was preempted by the GTSA. PHA Lighting Design, Inc. v. Kosheluk, No. 1:08-cv-01208-JOF, 2010 WL 1328745, * 11 (N.D. Ga. March 30, 2010). The plaintiff in PHA Lighting claimed that the defendant electronically copied the plaintiff's client lists and proposal and transmittal forms. Id. The plaintiff admitted the information was not a trade secret, but as the court noted, "the proprietary information alleged misappropriated by [defendant] does come within the types of intangible information that may be protected as trade secrets." Id. (citing O.C.G.A. § 10-1-761(4)). The court stated that the copies made by the defendant derived all of their value from the information contained therein and held: "Allowing Plaintiff to bring a claim for unjust enrichment and conversion based on [defendant's] conduct would subvert the purpose of the GTSA because Plaintiff would not have to prove that the information taken by [defendant] was a trade secret, yet could still recover for misappropriation of intangible, proprietary information." Id. The conversion claim was deemed preempted by the GTSA, and summary judgment granted to the defendant.

Falling in the middle of Penalty Kick and PHA Lighting is Diamond Power, 540 F.Supp.2d at 1322. Diamond Power is different because the court determined there was a fact question as to whether some information amounted to a trade secret, but

also determined that some information did not rise to the level of a trade secret. Id. at 1344. Nevertheless, the court found that the plaintiff's conversion claim was preempted by the GTSA. The court held:

> If a plaintiff could alternatively recover for misappropriation of non-proprietary information or misappropriation of unguarded proprietary information, the legislative judgment contained in the GTSA - that such information should otherwise flow freely in the public domain - would be subverted. And it would make little sense to go through the rigamarole of proving information was truly a trade secret if a plaintiff could alternatively plead claims with less burdensome requirements of proof. Since such an attempt to circumvent those requirements would be "in conflict" with the mandates of the GTSA, the GTSA renders such claims superseded.

Id. at 1345.

Since the conversion claim sought recovery for the same conduct and injury as the plaintiff alleged was caused by the misappropriation of its trade secrets - the taking of supposedly proprietary information - the court determined the conversion claim was preempted by the GTSA. Id. at 1345-46. See also Hauck Mfg. Co. v. Astec Indus., Inc., 375 F.Supp.2d 649, 661 (E.D. Tenn. 2004) (conversion claim was preempted by Uniform Trade Secrets Act even though the plaintiff sought to recover computer files and drawings which contained trade secrets as the tangible property the plaintiff alleged was stolen derived its primary, if not entire, value from the trade secrets contained therein); AutoMed Techs., Inc. v. Eller, 160 F.Supp.2d 915, 921 (N.D. Ill. 2001) (conversion claim based on software and design plans that were allegedly

misappropriated trade secrets was preempted by the Illinois Trade Secret Act because the claim was "really just another way of charging that defendants took [plaintiff's] secret information").

The outcome is the same here. Because the basis for Plaintiff's conversion claim - that Defendants allegedly took its proprietary information - is the same as its misappropriation of trade secrets claim, the Court finds that the conversion claim is preempted by the GTSA. Defendants are entitled to summary judgment on Count VI. Plaintiff's Motion for Summary Judgment as to Count VI is denied.

## L.     B & F's Count XII - Defamation

B & F next contends that Defendants are liable for both libel and slander, both of which are forms of defamation. A viable defamation claim under Georgia law consists of: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm. Saye v. Deloitte & Touche, LLP, 295 Ga. App. 128, 129-30, 670 S.E.2d 818 (2008) (citation omitted).

Libel is defined as "a false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule." O.C.G.A. § 51-5-1(a). To recover for libel, the allegedly libelous statement must be published. O.C.G.A. § 51-5-1(b). "A

libel is published as soon as it is communicated to any person other than the party libeled." O.C.G.A. § 51-5-3.

B & F alleges that Defendants made several libelous statements. One is the posting on www.school-for-champions.com which states: "Maxam - No longer in business as of 2007." (Pl.'s Ex. 120). Another is the posting on www.maxamwholesale.com in July 2007 by Jeff which states: "All Maxam Wholesale locations have been closed by B&F System Inc." (Pl.'s Ex. 129). The third is Jeff's email request to the webmaster of www.school-for-champions.com asking that "Maxam" be removed from the waterless cookware listing on the website because "[w]e have dissolved the company." (Pl.'s Ex. 120).

The basis for B & F's slander, or oral defamation, claim, appears to be that Defendants made charges against B & F "in reference to [its] trade, office, or profession, calculated to injure [it] therein." O.C.G.A. § 51-5-4(a)(4). B & F first points to the affidavit of Cupid Gainous in which she states that in February 2008, she stopped by the Tifton warehouse and was told by a "female employee" that "B & F had gone belly up. B & F was not reputable; it was not paying its bills; and so they dropped B & F." (Pl.'s Ex. 181, ¶ 5). B & F next refers to the affidavit of Richard Coristine in which he declares that in August or September 2007, he "called Maxam Wholesale of Atlanta as usual to purchase some products. I spoke to a female employee, and she told me that all locations of the B & F System and Maxam were shut down and out of business, but she could still help me with my purchases." (Pl.'s Ex. 182, ¶ 4). Finally, B & F refers to

65

Jody's deposition in which he testified that when people called the warehouse, they were told that "Maxam Wholesale of Atlanta, Inc. were out of business, or Maxam Wholesale of Georgia - - Atlanta was out of business" (Jody LeBlanc Dep., p. 331), and that employees were instructed to tell customers that "Maxam Wholesale is no longer in operation" if customers called and asked if they were calling Maxam Wholesale. (Jody LeBlanc Dep., p. 332).

Defendants set forth several defenses to the defamation claim. It appears the Court will have to separate out the various statements and determine whether any liability can attach.

The Court will start with the slander claim. Before addressing the merits, the Court notes that B & F is limited to a claim for slander per se because it did not include in its First Amended Complaint a plea for special damages under O.C.G.A. § 9-11-9(g). See Bellemead, LLC v. Stoker, 280 Ga. 635, 639, 631 S.E.2d 693 (2006).

> A court looks to the plain import of the words spoken in order to ascertain whether the words constitute slander per se. To be slander per se, the words are those which are recognized as injurious on their face - without the aid of extrinsic proof. Should extrinsic facts be necessary to establish the defamatory character of the words, the words may constitute slander, but they do not constitute slander per se. Thus, the court may not hunt for a strained construction in order to hold the words used as being defamatory as a matter of law, and the negative inference a hearer might take from the words does not subject the speaker for liability for slander per se. Furthermore, when words are defamatory per se, innuendo - which merely explains ambiguity where the precise meaning of terms used

66

in the allegedly slanderous statement may required elucidation - is not needed.

Id. at 637-38 (internal citations, quotations, and quotation marks omitted).

The first statements to consider are those that Defendants' employees made to Cupid Gainous that B & F had gone belly up, was not reputable, and was not paying its bills. Defendants contend these statements cannot support a defamation claim. The Court agrees. "The doctrine of respondeat superior does not apply in slander cases, and [a principal] is not liable for the slanderous utterances of an agent acting within the scope of his employment, unless it affirmatively appears that the agent was expressly directed or authorized to slander the plaintiff." Desmond v. Troncalli Mitsubishi, 243 Ga. App. 71, 75, 532 S.E.2d 463 (2000). There is no evidence that any of the Defendants directed or authorized the unnamed employee to make these sorts of remarks.

Next are the statements by the unnamed employee to Richard Coristine that all locations of the B & F System and Maxam were shut down and out of business. Jody testified that he told the employees to tell customers that Maxam Wholesale was out of business. But he also testified that he never told any customers that B & F was out of business. There is no evidence any Defendants told the employees to tell customers that B & F was out of business, so no liability can attach to Defendants for the alleged statement that B & F was out of business.

That leads to the statements about Maxam Wholesale being out of business. The question is whether that statement can be considered as making a charge against

67

B & F "in reference to its trade, office, or profession, calculated to injure [it] herein."

O.C.G.A. § 51-5-4(a)(3).

As the Georgia Supreme Court noted in <u>Bellemead, LLC</u>:

> The kind of aspersion necessary to come under this phase of the rule of slander per se must be one that is especially injurious to the plaintiff's reputation because of the particular demands or qualifications of plaintiff's vocation. . . .[T]he words must either be spoken of the plaintiff in connection with his calling or they must be of such a nature such as to charge him with some defect of character or lack of knowledge, skill, or capacity as necessarily to affect his competency successfully to carry on his business, trade, or profession.

280 Ga. at 637 (quoting Harper, James and Gray, THE LAW OF TORTS, Vol. 2, pp. 101-02, § 5.12 (2d ed. 1986)).

In <u>Bellemead, LLC</u>, the plaintiff claimed the defendant slandered him by telling a potential customer that "[plaintiff] isn't going to be selling lots here in Warner Robins much longer. He probably is going back to Valdosta, so if you want to buy those lots, you need to sign a contract with me." <u>Id.</u> at 636. The Court of Appeals held that a slander per se claim was viable because "the statements at issue could reasonably be interpreted as having the purpose of injuring [plaintiff's] business by stating or implying that [plaintiff] was going out of the development business in which he was still engaged and leaving the area, and that these assertions are capable of being proved false." <u>Stoker v. Bellemead, LLC</u>, 272 Ga. App. 817, 827, 615 S.E.2d 1 (2005).

The Supreme Court of Georgia reversed the Court of Appeals, and found that the statements did not constitute slander per se. The Supreme Court found that "[t]he words at issue cannot support a claim for slander per se since they are not recognizable as injurious on their face and do not, on their face, cast aspersions on [plaintiff's] reputation because of the particular demands or qualifications of his profession." 280 Ga. at 639.

The alleged statements in this case - that Maxam or Maxam Wholesale was out of business - are not that far removed from those found in Bellemead, LLC not to constitute slander per se. The statements certainly do not imply any dishonest or discreditable conduct on B & F's part. Cf. Infinite Energy, Inc. v. Pardue, --- S.E.2d ---, 2011 WL 2571917, * 2 (Ga. App. June 30, 2011) (allegations that the plaintiff "engaged in deliberate misinformation" and "deceived, cheated and misled" customers stated a claim for slander per se); Cassells v. Hill, No. 1:07-cv-2755-TCB, 2010 WL 4616573, * 6 (N.D. Ga. Nov. 8, 2010) (summary judgment denied on defamation claim where defendant accused a law enforcement officer of lying, of insubordination, and of using government funds in an inappropriate and unapproved manner).

The alleged defamation here is not made in reference to B & F's trade or business. Defendants did not say B & F refused to deliver goods to its customers or refused to pay its vendors, which are statements that would reference B & F's trade or business. See Van Epps v. Jones, 50 Ga. 238, 241 (1873) ("[T]he words must be charged to have been used in reference to one's trade or profession. The speaker must

69

[1] have had the trade or profession or the plaintiff in view, and [2] utter the words in reference to it, as if he should say of a grocery merchant, he keeps false weights, or of a lawyer, that he won't pay his clients the money he collects for them. . . .") The statement that Maxam or Maxam Wholesale was closed is not per se defamatory. Defendants are entitled to summary judgment on the slander per se claim. B & F's Motion on that issue is denied.

Now the Court will move on to the libel claim. As previously noted this claim is based in part on Jeff's email to the www.school-for-champions.com webmaster asking that the listing for Maxam be removed from the website. The email states that "[w]e have dissolved the company." After Jeff sent that email, the heading "No longer in business as of 2007" was listed on the website under Maxam. The libel claim is also based on Jeff's posting on the maxamwholesale websites that "all Maxam wholesale locations have been closed by B & F System Inc."

Like the slander claim, B & F has not pled special damages in connection with its libel claim. Thus, B & F is limited to a libel per se claim.

"The definition of slander in Georgia has been incorporated into the definition of libel." Lucas v. Cranshaw, 289 Ga. App. 510, 515, 659 S.E.2d 612 (2008) (quotation omitted). "Therefore, that which is slander per se can also become libel per se under the aegis of O.C.G.A. § 51-5-4." Id. (citation omitted). Thus, the question becomes, do the above-referenced statements make charges against B & F in reference to its trade, office, or profession, calculated to injure it therein? O.C.G.A. § 51-5-4(a)(3). The same

70

as with the allegedly slanderous statements, the Court finds that the written statements are not libelous per se. These statements on their face do not impugn B & F's trade or business. Defendants' Motion for Summary Judgment on the libel claim is granted. B & F's Motion for Summary Judgment on this issue is denied.

### M.     B & F's Count X - Preliminary and Permanent Injunctive Relief

Count X of the First Amended Complaint is a prayer for relief, not a cause of action. If such relief is proper following the trial of this case, the Court will enter the appropriate judgment at that time.

### N.     B & F's Count XI - Use of Advertising Ideas and Trade Dress Infringement

In Count XI of its First Amended Complaint, B & F contends that Defendants have used, misappropriated, and infringed B & F's advertising ideas, trade dress, trade secrets, and business style. In its response to Defendants' summary judgment motion, B & F states that it employed the "use of advertising ideas" terminology because "trade dress, and trademark infringement, as well as false marketing and false advertising constitute 'misappropriation of advertising ideas or style of doing business' for purpose of insurance coverage analysis." (Doc. 170, p. 35). This is not an insurance coverage case, however. The three cases cited by B & F in its summary judgment response are all insurance contract cases construing the laws of certain states, none of which are Georgia. *See* Hyman v. Nationwide Mut. Fire. Ins. Co., 304 F.3d 1179 (11th Cir. 2002) (interpreting Florida law); Super Duper Inc. v. Penn. Nat. Mut. Cas. Ins. Co., 385 S.C.

201, 683 S.E.2d 792 (2009) (interpreting South Carolina law); Elcom Techs. v. Hartford Ins. Co. of Midwest, 991 F.Supp. 1294 (D. Utah 1997) (interpreting Pennsylvania law). And upon its own review, since B & F made no reference to Georgia law, the Court found this sort of claim only in declaratory judgment actions or cases otherwise dealing directly with insurance policies. *See* Colony Ins. Co. v. Corrosion Control, Inc., 187 Fed. App'x 918 (11th Cir. 2006) (declaratory judgment action); Transp. Ins. Co. v. Freedom Elecs., Inc., 264 F.Supp.2d 1214 (N.D. Ga. 2003) (same). B & F's use of advertising ideas claim simply does not belong in this case. None of the Defendants are insurance companies, and there is no insurance policy at issue in this particular case.[21] Count XI is dismissed.

### O.     B & F's Count XV - Individuals Liable for Corporate Tort

In Count XV of its First Amended Complaint, B & F asserts that Lloyd, Jeff, and Jody, as officers or apparent officers, should be held personally liable for the torts committed by MWA, DSI, and PMDJ.

Generally, "one who merely occupies the capacity of a corporate officer cannot be held to be vicariously liable for such damages as would otherwise be recoverable from his corporate principal." Fields Bros. Gen. Contractors v. Ruecksties, 288 Ga. App. 674, 677, 655 S.E.2d 282 (2007) (quoting Smith v. Hawks, 182 Ga. App. 379, 384(4),

---

[21] The Court acknowledges that there is a pending declaratory judgment action filed by State Farm relating to policies held by Defendants. (Civil Action No. 7:09-cv-76).

355 S.E.2d 669 (1987)). However, there is an exception to this rule: "[A]n officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor." Id. (quoting Brown v. Rentz, 212 Ga. App. 275, 276(2), 441 S.E.2d 876 (1994) (physical precedent only)). Defendants' response to this claim is that because no torts were committed against B & F, there can be corporate officer liability. But the Court has found that there are questions for the jury to decide as to some of B & F's tort claims. The jury can decide the personal liability claims as well. B & F has not established that it is entitled to judgment on this issue - just conclusively stating that Lloyd, Jeff, and Jody are officers and are therefore liable is not sufficient to establish this claim as a matter of law, but as to the tort claims that are going to the jury, the possibility of individual liability is present if B & F can present sufficient evidence to show that Lloyd took part in the commission of any tort by MWA, or that Jeff or Jody took part in the commission of any tort by DSI or PMDJ. B & F's Motion for Summary Judgment on this particular issue is denied.

B & F next argues that Lloyd, Jeff, and Jody are individually liable for any trademark infringement committed by their respective companies. "[A] corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for such infringement without regard to piercing of the corporate veil." Babbit Elecs., Inc. v. Dynascan Corp., 38 F.3d 1161, 1184 (11th Cir. 1994). Defendants state that there can be no personal liability because there was no trademark infringement. Like the tort claims, however, the jury must decide some of the

infringement claims. At that same time, B & F may present evidence to show that Lloyd, Jeff, or Jody was the moving force behind the infringing activity. It will be left to the jury to determine if those defendants can be held personally liable for any corporate infringement. B & F's Motion for Summary Judgment is denied on this issue.

Finally, B & F argues that Lloyd, Edna, Jeff, and Jody should be held jointly and severally liable based on a civil conspiracy theory.

> A conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means. To recover damages for a civil conspiracy claim, a plaintiff must show that two or more persons, acting in concert, engaged in conduct that constitutes a tort. Absent the underlying tort, there can be no liability for civil conspiracy.

J. Kinson Cook of Ga., Inc. v. Heery/Mitchell, 284 Ga. App. 552, 560, 644 S.E.2d 440 (2007) (quotation omitted).

The Court has determined that questions of fact exist as to some of B & F's tort claims. Thus, the civil conspiracy claim cannot be dismissed out of hand. "Because civil conspiracy is by its nature a secret endeavor, concert of action, amounting to conspiracy, is best suited for jury resolution." Argentum Intern., LLC v. Woods, 280 Ga. App. 440, 444, 634 S.E.2d 195 (2006) (quoting Traub v. Washington, 264 Ga. App. 541, 546(6), 591 S.E.2d 382 (2003)).

B & F has not established a civil conspiracy as a matter of law, but because there are jury issues regarding some of B & F's tort claims, the jury will also be allowed

to determine the conspiracy claim. B & F's Motion for Summary Judgment on this matter is denied.

**P.     B & F's Count XVI - Common Enterprise**

Georgia courts recognize a common business enterprise theory of liability. In Fort & Turner Enterprises, Inc. v. Scrocca, 195 Ga. App. 554, 555, 394 S.E.2d 364 (1990), the Georgia Court of Appeals determined that three corporations could be held jointly liable to the appellee under the theory that they were joint participants in a common business enterprise. The evidence in Fort & Turner showed that the three corporations had the same majority shareholder, president, vice-president, secretary, and general manager. Id. The corporations held themselves out to the public has being components of a single business operations. Id. They also collectively entered into contracts for their common benefit under a single name. Id. Finally, the corporations collectively filed a lawsuit under the single name on the theory that money owed was owed to them collectively. Id.

B & F has moved for summary judgment on the issue of common enterprise. It argues that MWA, DSI, and PMDJ acted as a single business enterprise, were under the same management, split profits, and appeared in this litigation collectively.

75

Therefore, according to B & F, the corporations should be held jointly liable as a common business enterprise.[22]

On the record before it, the Court does not believe B & F has established its common enterprise claim as a matter of law. MWA did not have the same officers as DSI and PMDJ. Unlike the corporations in Fort & Turner, MWA, DSI, and PMDJ did not collectively file this lawsuit against B & F. Instead, B & F filed it against them. MWA and DSI are pursuing separate and independent counterclaims against B & F - they are not seeking to recover collectively against B & F - and PMDJ is merely a defendant. Further, to the Court's knowledge, any profit sharing was between Lloyd, Jeff, and Jody, not between MWA, DSI, and PMDJ.

The common enterprise issue will have to be decided by the jury. B & F's Motion for Summary Judgment on Count XVI is denied.

### Q.    B & F's Count XVII - Alter Ego and Disregard of Corporate Entities

In Count XVII, B & F seeks to pierce the corporate veils of MWA, LeBlanc's, PMDJ, and DSI, and hold Lloyd, Jeff, and Jody personally liable for all amounts owed by the corporations.

--------------------

[22] In its First Amended Complaint, B & F contends that all of the Defendants, both individual and corporate, should be held jointly liable under a common enterprise theory. However, it appears to the Court that this particular theory only applies to corporate or similar business entities. B & F has not provided any legal authority showing that individual defendants are subject to a common enterprise claim, and in

Piercing the corporate veil is based on the idea that "a corporate officer, or owner, who has abused the corporate form by commingling personal and corporate assets, should be held liable for corporate debts and liabilities." Pazur v. Belcher, 290 Ga. App. 703, 705, 659 S.E.2d 804 (2008).

> To prevail based upon this theory, it is necessary to show that the shareholders disregarded the corporate entity and made it a mere instrumentality for the transaction of their own affairs; that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist. [Cit.] The concept of piercing the corporate veil is applied in Georgia to remedy injustices which arise where a party has over extended his privilege in the use of a corporate entity in order to defeat justice, perpetrate fraud or to evade contractual or tort responsibility.

Baillie Lumber Co. v. Thompson, 279 Ga. 288, 289-90, 612, S.E.2d 296 (2005) (quoting Heyde v. Xtraman, Inc., 199 Ga. App. 303, 306, 404 S.E.2d 607 (1991)). "In general, equitable principles govern the alter ego doctrine. As a consequence, a claim for piercing the corporate veil is appropriately granted only in the absence of adequate remedies at law." Id. (citations and punctuation omitted).

Even assuming that the Defendants commingled funds, shared business space and equipment, split profits, and did all of the other actions alleged by B & F in its summary judgment motion, B & F's alter ego claim still fails. This is because as a precondition to a plaintiff's piercing the corporate veil, the plaintiff must show insolvency

---

any event, B & F appears to abandon that portion of its claim, as its Motion for Summary Judgment only relates to the corporate defendants.

on the part of the corporations. <u>Great Dane Ltd. P'ship v. Rockwood Serv. Corp.</u>, No. CV410-265, 2011 WL 2312533, *4 (S.D. Ga. June 8, 2011) ("But Georgia veil-piercing law requires, as a minimum prerequisite, that there be insolvency on part of the corporation - that there be insufficient corporate assets to satisfy the plaintiff's claim.") As noted above, the corporate veil cannot be pierced if there is an adequate remedy at law, and "[s]olvency - having the means to pay a money judgment - means there exists an adequate remedy at law." <u>In re Friedman's Inc.</u>, 385 B.R. 381, 415 (S.D. Ga. 2008), *modified on other grounds*, 394 B.R. 623 (S.D. Ga. 2008). "If the plaintiff fails to allege that the corporation is insolvent, then the Court must assume that the plaintiff has an adequate remedy at law. That, in turn, renders unavailable the equitable remedy of piercing the corporate veil." <u>Id</u>. *See also* <u>Great Dane</u>, 2011 WL 2312533 at *4 (disallowing discovery on veil-piercing because the plaintiff had not pled insolvency as to any defendant).

B & F has not shown or even pled insolvency on the part of any of the corporate Defendants. Thus, B & F has an adequate remedy at law. Piercing the corporate veil under these circumstances would not be proper. B & F's Motion for Summary Judgment on Count XVII is denied, and Count XVII is dismissed.

### R.    Lloyd and MWA's Second Counterclaim - Tortious Interference with Contractual and Business Relations

In their Second Counterclaim, Lloyd and MWA contend that B & F's attempt to terminate the MIDA on May 15, 2007 and subsequent seizure of the inventory from the

warehouse precluded Lloyd and MWA from fulfilling existing contractual obligations to customers and from entering into new business relationships with potential customers.

As discussed with respect to B & F's Count VIII, to establish a cause of action for wrongful interference with contractual relations, in addition to demonstrating the existence of a valid contract, a plaintiff must show that the defendant: (1) acted improperly and without privilege; (2) acted purposely and maliciously with the intent to injure; (3) induced a third party not to enter into or to continue a business relationship with the plaintiff; and (4) caused the plaintiff some financial injury. Quality Foods, 288 Ga. App. at 55-56 (2007) (quotation omitted). The elements of a tortious interference with business relations claim are the same as a contractual relations claim, with the exception of the requirement that there by a valid contract. See Gordon Document Prods., 308 Ga. App. at 449.

While B & F argues that the tortious interference claims fail because B & F is not a stranger to the contractual or business relationships, the Court finds that B & F is entitled to summary judgment on these claims for a much simpler reason. There is no evidence that B & F induced a third party not to enter into or continue a business relationship with the Defendants. Inducement is an essential element of a tortious interference claim. See Great Sw. Exp. Co., Inc. v. Great Am. Ins. Co. of N.Y., 292 Ga. App. 757, 759, 665 S.E.2d 878 (2008). As Lloyd and MWA have failed to establish an essential element of their tortious interference claim, B & F is entitled to summary judgment on the Second Counterclaim.

79

**S.     Lloyd's and MWA's Third Counterclaim - Breach of the Covenant of Good Faith and Fair Dealing**

In their Third Counterclaim, Lloyd and MWA argue that B & F violated the covenant of good faith and fair dealing implied under Georgia law by terminating the MIDA without reasonable notice.

B & F contends that it is entitled to summary judgment on the Third Counterclaim because a claim for breach of the covenant of good faith and fair dealing cannot form the basis of an independent cause of action. *See* Stuart Enters. Int'l, Inc. v. Peykan, Inc., 252 Ga. App. 231, 234, 555 S.E.2d 881 (2001). While that is true, the Court has determined that a portion of Lloyd's and MWA's breach of contract claim will go to the jury. If the jury finds for Lloyd and MWA on the breach of contract claim, it could also find for them on this derivative claim. Thus, B & F's Motion for Summary Judgment as to the Third Counterclaim is denied.

**T.     Lloyd's and MWA's Fourth Counterclaim - Breach of Contract**

The Fourth Counterclaim consists of several claims. In one, Lloyd and MWA contend that B & F breached the MIDA by opening or licensing another distributorship within the trade area assigned to Lloyd. B & F has moved for summary judgment on this portion of the breach of contract claim, arguing that the claim is barred by the statute of limitations. Lloyd and MWA do not dispute that this claim is barred by the statute of limitations, and the Court finds that it is in fact barred. B & F is entitled to summary judgment as to the distributorship claim.

The remainder of the Fourth Counterclaim deals with B & F's alleged failure to pay commissions, B & F's alleged attempts to make direct sales to customers in Lloyd's assigned territories, and B & F's alleged failure to provide customer lists. These claims will go to the jury as neither party moved for summary judgment on them.

B & F does raise one other issue with regard to the Fourth Counterclaim that needs to be addressed. B & F contends that MWA does not have standing to assert the breach of contract counterclaim because MWA was not a party to the MIDA, and Lloyd never assigned the MIDA to MWA. Lloyd and MWA argue in response that B & F cannot on one hand contend that MWA does not have standing on this claim but on the other hand assert that Lloyd and MWA are alter egos of each other. As discussed with regard to B & F's Count XVII, the alter ego theory of liability cannot stand in this case, so the Court believes consideration of the standing argument is appropriate.

It is undisputed that MWA was not a party to the MIDA. MWA is a third party now seeking to enforce provisions of the MIDA. "In order for a third party to have standing to enforce a contract, it must clearly appear from the contract that it was *intended* for his or her benefit. The mere fact that the third party would benefit from performance of the agreement is not alone sufficient." Donnalley v. Sterling, 274 Ga. App. 683, 685, 618 S.E.2d 639 (2005) (punctuation omitted) (emphasis in original). "Although the third-party beneficiary need not be specifically named in the contract, the contracting parties' intention to benefit the third party must be shown on the face of the contract." Id. (quotation omitted). There is nothing in the MIDA showing it was intended to benefit

MWA. Actually, including such a benefit would have been impossible because the MIDA was signed in 1986 and MWA was not incorporated until 2004. The MIDA was never amended to address the creation of MWA, and in fact, B & F disputes ever being aware of the existence of MWA. As noted earlier, Lloyd never assigned his rights under the MIDA to MWA. MWA does not have standing to bring the breach of contract claim. Lloyd alone will be allowed to present the breach of contract claim at the trial of this case.[23]

### U. Lloyd's and MWA's Fifth Counterclaim - Uniform Deceptive Trade Practices Act Violations - O.C.G.A. § 10-1-372

Lloyd and MWA assert in their Fifth Counterclaim that B & F violated the Georgia Uniform Deceptive Trade Practices Act ("GUDTPA"), O.C.G.A. § 10-1-372, by mailing the letters to their customers stating that Maxam Wholesale of Atlanta had ceased operation. It appears that this counterclaim is based on subsection (a)(8) of the GUDTPA, which provides that one engages in a deceptive trade practice when he, in the course of his business, "disparages the goods, services, or business of another by false or misleading representations of fact." O.C.G.A. § 10-1-372(a)(8). As discussed

---

[23] B & F also argues that MWA cannot bring this counterclaim because MWA was administratively dissolved in 2010. But B & F did not raise that issue until its reply brief in support of its Motion for Summary Judgment, and the Court will not consider it. *See* United States v. Coy, 19 F.3d 629, 632 n. 7 (11th Cir. 1994) ("[a]rguments raised for the first time in a reply brief are not properly before a reviewing court"); United States v. Oakley, 744 F.2d 1553, 1556 (11th Cir. 1984) (same).

*supra*, however, the Court does not find a statement that a business has closed to be disparaging.

In any event, the only relief available under the GUDTPA is injunctive relief, so Lloyd's and MWA's request for monetary damages must nevertheless be dismissed. As for any injunctive relief, Lloyd and MWA have not presented any evidence that they are "likely to be damaged" by the alleged deceptive trade practices in the future. *See* Catrett v. Landmark Dodge, Inc., 253 Ga. App. 639, 644, 560 S.E.2d 101 (2002). "Damage alleged caused by the [2007] misrepresentation cannot be remedied through an injunction. To survive summary judgment, [Lloyd and MWA] had to raise a factual question about the likelihood of some future wrong." Id. (footnote omitted). Lloyd and MWA have not done so, which means B & F is entitled to summary judgment on the Fifth Counterclaim.

### V.    Lloyd's and MWA's Sixth Counterclaim - Fair Business Practice Act Violations - O.C.G.A. § 10-1-393

Lloyd and MWA contend that B & F violated the Georgia Fair Business Practice Act ("GFBPA"), O.C.G.A. § 10-1-393, by sending out the two mailings which stated that Maxam Wholesale of Atlanta had ceased operation. They specifically state that B & F violated subsection (b)(8) by "disparaging goods, services, or business of another by false or misleading representation." O.C.G.A. § 10-1-393(b)(8).

While B & F contends the GFBPA claim fails because Lloyd and MWA have not shown that the alleged conduct affected the public interest, the Court finds that it fails

for another reason. "A private FBPA claim has three elements: a violation of the Act, causation, and injury." Tiismann v. Linda Martin Homes Corp., 281 Ga. 137, 139, 637 S.E.2d 14 (2006) (punctuation, quotation marks, and quotation omitted). "[A] private right of action is available only to a person who suffers injury or damages as a result of a violation [of the FBPA]." Small v. Savannah Intern. Motors, Inc., 275 Ga. App. 12, 15, 619 S.E.2d 738 (2005) (quotation omitted). Under the GFBPA, "the measure of damages . . . is that of 'actual injury suffered.'" Regency Nissan, Inc. v. Taylor, 194 Ga. App. 645, 649, 391 S.E.2d 467 (1990). Lloyd and MWA have presented no evidence of an injury arising from the alleged GFBPA violation. As Lloyd and MWA have not established all three elements of a GFBPA claim, B & F is entitled to summary judgment on the Sixth Counterclaim.

## W.    Lloyd's and MWA's Eighth Counterclaim - Defamation

In their Eighth Counterclaim, Lloyd and MWA state that B & F libeled them by sending out the two mailings stating that Maxam Wholesale of Atlanta had ceased operation.

As stated in connection with B & F's defamation claim, a viable defamation claim under Georgia law consists of: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm. Saye, 295 Ga. App. at 129-30. Lloyd and MWA contend that B & F committed libel per se because its statements that Maxam

84

Wholesale of Atlanta was out of business were charged against Lloyd and MWA "in reference to [their] trade, office, or profession, calculated to injure [them] therein." O.C.G.A. § 51-5-4(a)(4). However, the libel claim suffers from the same deficiency B & F's claim does - a statement that a company is out of business or has ceased operation is not per se defamatory. Such a statement simply does not constitute a charge in reference to one's trade or profession as is required to establish a libel per se claim. B & F is entitled to summary judgment on the Eighth Counterclaim.

## X.    Lloyd's and MWA's Ninth Counterclaim - Violation of Lanham Act, 15 U.S.C. § 1125(a)

Lloyd and MWA argue in their Ninth Counterclaim that B & F violated § 43(a)(1)(B) of the Lanham Act by falsely advertising that Maxam Wholesale of Atlanta had ceased operation. This statute provides:

> (1) Any person who, or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which - -
>
> (B) in commercial advertising or promotion misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

To succeed on a false advertising claim, Lloyd and MWA must show five things: (1) the ads of the opposing party were false or misleading; (2) the ads deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been - or is likely to be - injured as a result of the false advertising. Johnson & Johnson, 299 F.3d at 1247.

Lloyd and MWA's false advertising claim fails because there is no evidence that the alleged deception had a material effect on any consumers' purchasing decisions. Materiality must be established for a false advertising claim to survive. As Lloyd and MWA have not shown materiality, B & F's Motion for Summary Judgment on the Ninth Counterclaim is granted.[24]

**Y.     Counterclaim of DSI, Jeff, and Jody**

In their counterclaim, DSI, Jeff, and Jody have requested that the Court cancel and remove from the USPTO Supplemental Register the trademark registered by B & F bearing the registration number 3,266,496. This trademark registration is for the lid knob, and is described as a "pot and pan lid knob featuring a button thereon for opening a steam control valve that is part of the lid knob sold as a component part of

---

[24] The Seventh Counterclaim is a state law false advertising claim brought pursuant to O.C.G.A. § 10-1-421. As the state claim is evaluated in the same manner as the Lanham Act claim, B & F is also entitled to summary judgment on the Seventh Counterclaim.

cookware in the nature of pots and pans." (Doc. 110-1). DSI, Jeff, and Jody contend

that the trademark should be cancelled because it seeks to protect functional features

of the product and because the mark is not distinctive.

Section 1119 of Title 15 of the United States Code provides:

> In any action involving a registered mark the court may
> determine the right to registration, order the cancelation of
> registrations, in whole or in part, restore canceled
> registrations, or otherwise rectify the register with respect to
> the registrations of any party to the action. Decrees and
> orders shall be certified by the court to the Director, who
> shall make appropriate entry upon the records of the Patent
> and Trademark Office, and shall be controlled thereby.

15 U.S.C. § 1119.

No party moved for summary judgment on this counterclaim. This is a permissive

statute, as reflected by use of the term "may." Depending on the jury's decisions on the

questions before it, cancelation of the registration may be appropriate. The Court simply

does not know at this time. The Court will make a ruling with regard to this counterclaim

after the trial of this case.

## V.    CONCLUSION

As outlined above, Defendants' Motion for Summary Judgment (Doc. 152) and

Plaintiff's Motion for Summary Judgment (Doc. 159) are both granted, in part, and

denied, in part. Counts XI and XVII of the First Amended Complaint are dismissed.

The remaining issues will be tried to a jury during the Court's trial term

commencing on January 9, 2012 in Valdosta, Georgia. The trial will most likely be

bifurcated, with the jury first determining (1) whether there was a partnership between Lloyd, Jeff, and Jody; (2) when the SMLA was terminated; (3) whether there was a mutual agreement to terminate the MIDA on May 15, 2007; and (4) whether Edna was aware of the SMLA. The jury will then determine (1) B & F's breach of contract claim as to Paragraphs 3, 4, and E of the MIDA; (2) B & F's breach of the SMLA claim; (3) whether B & F wrongfully terminated the MIDA; (4) B & F's inducing breach claim as to the MIDA; (5) whether PMDJ or DSI tortiously interfered with the MIDA; (6) whether Jeff, Jody, Edna, DSI, or PMDJ tortiously interfered with the SMLA; (7) whether Defendants infringed B & F's rights in its registered trademarks under 15 U.S.C. § 1114; (8) B & F's false designation of origin claim under 15 U.S.C. § 1125(a) and GUDPTA claim; (9) B & F's cyberpiracy claim against Jeff; (10) whether Lloyd, Jeff, and Jody should be held personally liable for the torts or trademark infringement committed by MWA, DSI, and PMDJ; (11) whether Lloyd, Edna, Jeff, and Jody should be held jointly and severally liable based on a civil conspiracy theory; (12) whether MWA, DSI, and PMDJ acted as a common business enterprise; (13) whether B & F violated the covenant of good faith and fair dealing; and (14) Lloyd's breach of contract claim as to the MIDA and B & F's alleged failure to pay commissions, attempts to make direct sales to customers in Lloyd's assigned territories, and failure to provide customer lists. The counterclaim filed by DSI, Jeff, and Jody will be addressed by the Court after the trial of the case.

**SO ORDERED**, this the 14th day of September, 2011.

*/s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

mbh