IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | |
|---|---|
| THE B & F SYSTEM, INC., <br><br> Plaintiff, <br><br> v. <br><br> LLOYD J. LEBLANC JR., MAXAM WHOLESALE OF ATLANTA, INC., DIRECT SOURCE IMPORTS, INC., ARTHUR JEFFREY LEBLANC, LLOYD LEBLANC, III, PRODUCTOS MEXICANOS DON JOSE, INC., LEBLANC'S LLC, and EDNA G. LEBLANC, <br><br> Defendants. | Civil Action No. 7:07-CV-192 (HL) |



FILED

FEB - 1 2012

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA

## JURY CHARGES - PHASE II

LADIES AND GENTLEMEN:

You have heard Phase II of the trial of this case and it now becomes my duty to explain to you the rules of law which you must follow and apply in reaching a decision in this phase. When I have concluded, you will retire to the jury room and begin your deliberations.

In deciding this phase of the case, you must follow and apply all of the law as I explain it to you, whether you agree with that law or

not; and you must not let your decision be influenced in any way by sympathy, or by prejudice, for or against anyone.

The fact that a corporation is involved as a party must not affect your decision in any way. A corporation and all other persons stand equal before the law and must be dealt with as equals in a court of justice. When a corporation is involved, of course, it may act only through people as its employees; and, in general, a corporation is responsible under the law for any of the acts and statements of its employees that are made within the scope of their duties as employees of the company.

In your deliberations, you should consider only the evidence - - that is, the testimony of the witnesses and the exhibits I have admitted in the record - - but as you consider the evidence, both direct and circumstantial, you may make deductions and reach

conclusions which reason and common sense lead you to make. Direct evidence is the testimony of one who asserts actual knowledge of a fact, such as an eyewitness. Circumstantial evidence is proof of a chain of facts and circumstances tending to prove, or disprove, any fact in dispute. The law makes no distinction between the weight you may give to either direct or circumstantial evidence.

Remember that anything the lawyers have said is not evidence in the case. And, except for my instructions to you on the law, you should disregard anything I have said during the trial in arriving at your decisions concerning the facts. It is your own recollection and interpretation of the evidence that controls.

Now, in saying that you must consider all of the evidence, I do not mean that you must accept all of the evidence as true or accurate. You should decide whether you believe what each witness

had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness, in whole or in part. Also, the number of witnesses testifying concerning any particular dispute is not controlling.

In deciding whether you believe or do not believe any witness I suggest that you ask yourself a few questions:

Did the witness impress you as one who was telling the truth?

Did the witness have any particular reason not to tell the truth?

Did the witness have a personal interest in the outcome of the case?

Did the witness seem to have a good memory?

Did the witness have the opportunity and ability to observe accurately the things he or she testified about?

4

Did the witness appear to understand the questions clearly and answer them directly?

Did the witness' testimony differ from other testimony or other evidence?

You should also ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact; or, whether there was evidence that at some other time the witness said or did something, or failed to say or do something, which was different from the testimony the witness gave before you during the trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people naturally tend to forget some things or remember other things inaccurately. So, if a

witness has made a misstatement, you need to consider whether that misstatement was simply an innocent lapse of memory or an intentional falsehood; and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

When knowledge of a technical subject matter might be helpful to the jury, a person having special training or experience in that technical field is permitted to state an opinion concerning those technical matters.

Merely because such a witness has expressed an opinion, however, does not mean that you must accept that opinion. The same as with any other witness, it is up to you to decide whether to rely upon it.

In this phase each party asserting a claim or an affirmative defense has the responsibility to prove every essential part of the claim or affirmative defense by a preponderance of the evidence. This is sometimes called the burden of proof or the burden of persuasion.

A preponderance of the evidence simply means an amount of evidence that is enough to persuade you that a claim is more likely true than not true.

When more than one claim is involved, and when more than one affirmative defense is asserted, you should consider each claim and each affirmative defense separately; but in deciding whether any fact has been proved by a preponderance of the evidence, you may consider the testimony of all of the witnesses, regardless of

who may have called them, and all of the exhibits received in evidence, regardless of who may have produced them.

If the proof fails to establish any essential part of a claim by a preponderance of the evidence you should find against the party making that claim.

It is possible that you may find for B&F on one or more of its claims and that you may find for Lloyd LeBlanc on one or more of his counterclaims. If this happens, simply record your findings according to the verdict form and the Court will deal with any questions at a later date.

## **BREACH OF CONTRACT**

The first claims about which you heard evidence in the second phase of the trial were the parties' breach of contract claims. I will review briefly what the breach of contract claims are, and will then charge you on the applicable law for those claims.

You must decide whether Lloyd LeBlanc breached Paragraphs 4 or E of the Maxam Independent Distributor Agreement. In determining whether there was a breach of contract, you are to consider only Paragraphs 4 and E of the Maxam Independent Distributor Agreement and no other paragraphs of the Agreement. B&F bears the burden of showing a breach of the Maxam Independent Distributor Agreement by a preponderance of the evidence.

The Maxam Independent Distributor Agreement makes reference to the MID and the Company. The MID is Lloyd LeBlanc. The Company is B&F.

Paragraph 4 of the Maxam Independent Distributor Agreement states that: "MID further agrees to cooperate with all of the Company's promotional programs, and to sell all of the Company's existing customers as well as making a continuing effort to establish new accounts and customers that will become part to The B & F System master customer list."

Paragraph E of the Maxam Independent Distributor Agreement states that: "The Company will supply printouts of master customer list for area, inventory status reports, and other such reports as available at no charge. The master customer list remains the

property of The B & F System, Inc., and may not be sold, leased, or given to any person or company for any purpose whatsoever."

You must also decide whether Lloyd LeBlanc breached Paragraphs 1, 2, 3, 4, or 6 of the Service Mark License Agreement. B&F bears the burden of showing a breach of the Service Mark License Agreement by a preponderance of the evidence.

The Service Mark License Agreement makes reference to the Licensee. Lloyd LeBlanc is the Licensee.

Paragraph 1 of the Service Mark License Agreement states: "Licensee acknowledges that B & F has the sole and exclusive rights to use the mark 'MAXAM' as a service mark in connection with wholesale and retail sales services."

Paragraph 2 of the Service Mark Agreement states: "B & F hereby grants Licensee a royalty-free nonexclusive right and license, cancellable at will, to use the service mark 'MAXAM' for retail and wholesale sales services, to use the mark 'MAXAM' as part of its business title, and to otherwise enjoy the goodwill associated with said mark. The nature of the services with which the service mark 'MAXAM' is to be used by Licensee shall have the approval of B & F in order to maintain the high standards of quality associated with the service mark 'MAXAM.' It is agreed by B & F that the present standards of services rendered by Licensee are satisfactory and Licensee agrees to maintain the present standards of quality services rendered during the duration of the license herein granted."

Paragraph 3 of the Service Mark License Agreement states: "Licensee shall not in any manner represent that Licensee has any ownership in the mark licensed herein, any registration thereof, or

any other mark incorporating the term 'MAXAM'; and acknowledges that Licensee's use of the mark shall not create in Licensee any right, title or interest in or to the licensed mark or any other mark incorporating the term 'MAXAM,' other than the license herein granted.

Paragraph 4 of the Service Mark License Agreement states: "Licensee agrees that it will exercise the right granted hereby in strict compliance with the limitations hereof and will comply with all instructions and limitations regarding use of the mark submitted to Licensee in writing by B & F. Licensee further agrees to permit B&F, through any duly authorized representative, to inspect Licensee's premises to determine compliance with the terms and conditions of the license herein granted."

Paragraph 6 of the Service Mark License Agreement states: "Either party hereto may terminate this license at any time by delivery of written notice of termination to the other party. Upon termination of the license herein granted, Licensee shall immediately cease and desist from any further use of the mark 'MAXAM' or any colorable imitation thereof in any form and, if Licensee has included the term 'MAXAM' in its corporate name or title, Licensee shall immediately change such corporate name or title to delete therefrom the term 'MAXAM.'"

You must also decide whether B&F breached Paragraph 9 of the Maxam Independent Distributor Agreement. Lloyd LeBlanc bears the burden of showing a breach of Paragraph 9 by a preponderance of the evidence.

Paragraph 9 of the Maxam Independent Distributor Agreement states: "Unless otherwise mutually agreed, the termination of this Agreement may be made by the MID by giving ninety (90) days written notice to the Company. Unless mutually agreed, the termination of this Agreement may be made by the Company by giving no less than ninety (90) days written notice to the MID, but only if due cause can be shown for such termination."

You must also decide whether the Maxam Independent Distributor Agreement was modified or amended through course of dealing or course of performance, and whether the Agreement, as modified or amended, was breached by B&F. The particular provisions of the Maxam Independent Distributor Agreement at issue in this counterclaim are Paragraphs E, 5, 7, and 22. You must decide whether Lloyd LeBlanc has proven a modification or

amendment of the Maxam Independent Distributor Agreement and a breach by B&F by a preponderance of the evidence.

Paragraph E of the Maxam Independent Distributor Agreement states: "The Company will supply printouts of master customer list for area, inventory status reports, and other such reports as available at no charge. The master customer list remains the property of The B & F System, Inc., and may not be sold, leased, or given to any person or company for any purpose whatsoever."

Paragraph 5 of the Maxam Independent Distributor Agreement states: "Tifton, Georgia will be the city in which the MID will establish the base of operation and have the warehouse and showroom. The B & F System, Inc. will not open another Maxam Independent Distributor or Company branch within this trade area."

Paragraph 7 of the Maxam Independent Distributor Agreement states: "The MID shall be credited with all orders written and delivered from MID facility. Further, a 3% commission rate will be paid on orders shipped from Dallas to customers established and placed on the Company's master customer list by MID, when MID request that such orders be shipped by the Dallas warehouse. Special commissions may vary and apply to special promotions and types of sales. Variations and special commissions may vary and apply to special promotions and types of sales. Variations and special commissions will be furnished to MID in writing before such special sales are made."

Paragraph 22 of the Maxam Independent Distributor Agreement states in part: "The B & F System, Inc. further agrees to provide a pricing structure that will allow MID to receive: A. Gross profits of the difference between Dallas case price less 12.8 percent

(12.8%) and the selling price on regular catalog items. Close outs, overstock specials, advertising specials, and other discounted selling prices will carry a profit of between fifteen percent (15%) and three percent (3%) less any discounts earned on invoice. From time to time, there may be items sold with no profits earned. - K items will carry a profit less than 12.8%"; and "E. Any customer given a special price at the instruction of Dallas will carry at least a three percent (3%) commission on the total invoice."

You must also decide whether B&F breached the covenant of good faith and fair dealing implied under Georgia law. Lloyd LeBlanc bears the burden of proof by a preponderance of the evidence on this counterclaim.

Only if you find in favor of Lloyd LeBlanc on one of his breach of contract counterclaims would you be authorized to find that B&F breached the covenant of good faith and fair dealing.

I have reviewed the nature of the breach of contract claims. I will now instruct you on the law governing each of the breach of contract claims.

A contract is an agreement between two or more parties for the doing or not doing of some specified thing.

Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement. Whenever the cooperation of the promise is necessary for the performance of the promise, there is an implied promise that cooperation will be given. Unintentional failure to perform duties under a contract nevertheless

constitutes a breach of contract for which damages may be recovered. However, there can be no breach of the implied covenant of good faith where a party to a contract does what the contract expressly allows it to do.

A breach of contract arises by the failure of a party to perform under the terms of the contract without legal excuse, fault, or consent of the opposite party.

A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the

performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

Where one who can read signs a contract without reading it, he is bound by its terms.

Where instruments are executed at the same time and in the course of the same transaction, they should be read and construed together.

The relation of principal and agent arises whenever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf.

The principal shall be bound by all the acts of his agent within the scope of his authority; if the agent shall exceed his authority, the principal may not ratify in part and repudiate in part; he shall adopt either the whole or none.

If you find for B&F on any of its breach of contract claims, you must determine B&F's damages.

If you find for Lloyd LeBlanc on any of his breach of contract counterclaims, you must determine Mr. LeBlanc's damages.

Damages are given as compensation for injury sustained.

Damages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from the

breach and such as the parties contemplated when the contract was made as the probable result of the breach.

The measure of damages for breach of contract is the amount which will compensate the injured party for a loss which a fulfillment of the contract would have prevented or the breach of it entailed. That is, the injured party is, so far as it is possible to do so by a monetary award, to be placed in the position it would have been in had the contract been fully performed.

In every case of breach of contract, the party not breaching it has a right to damages. But, if there has been no actual damage, the non-breaching party can recover nominal damages.

Nominal damages are generally defined as a trivial sum awarded where a breach of duty or an infraction of the plaintiff's right

is shown, but no serious loss is proved. However, the term nominal damages is purely relative, and carries with it no suggestion of certainty as to amount.

Remote or consequential damages are not allowed whenever they cannot be traced solely to the breach of the contract, unless they may be computed exactly, such as the profits that are the immediate fruit of the contract and are independent of any collateral enterprises entered into in contemplation of the contract.

Where by a breach of contract a party is injured, he is bound to lessen the damages as far as is practicable by the use of ordinary care and diligence.

Any person who claims damages as a result of an alleged wrongful act on the part of another has a duty under the law to

mitigate those damages - that is, to take advantage of any reasonable opportunity that may have existed under the circumstances to reduce or minimize the loss or damage.

## TORTIOUS INTERFERENCE WITH
## CONTRACTUAL RELATIONS

The second claims about which you heard evidence in this phase of the trial were B&F's tortious interference with contractual relations claims. I will review briefly what the tortious interference claims are, and will then charge you on the applicable law for those claims. B&F bears the burden of proof by a preponderance of the evidence on all of the tortious interference claims.

You must decide whether Productos Mexicanos Don Jose, Inc. tortiously interfered with the contractual relationship between Lloyd

25

LeBlanc and B&F established by the Maxam Independent Distributor Agreement prior to the termination of the Agreement on May 31, 2007.

You must decide whether Direct Source Imports, Inc. tortiously interfered with the contractual relationship between Lloyd LeBlanc and B&F established by the Maxam Independent Distributor Agreement. However, any tortious interference claim against Direct Source Imports, Inc. is limited to the time period between the incorporation of Direct Source Imports, Inc. on May 25, 2007 and the date the Maxam Independent Distributor Agreement was terminated, May 31, 2007.

You must also determine whether Edna LeBlanc tortiously interfered with the contractual relationship between B&F and Lloyd

LeBlanc as established by the Service Mark License Agreement prior to the termination of the Agreement on November 12, 2007.

You must determine whether Jeff LeBlanc tortiously interfered with the contractual relationship between B&F and Lloyd LeBlanc as established by the Service Mark License Agreement prior to the termination of the Agreement on November 12, 2007.

You must decide whether Jody LeBlanc tortiously interfered with the contractual relationship between B&F and Lloyd LeBlanc as established by the Service Mark License Agreement prior to the termination of the Agreement on November 12, 2007.

You must determine whether Productos Mexicanos Don Jose, Inc. tortiously interfered with the contractual relationship between B&F and Lloyd LeBlanc as established by the Service Mark License

Agreement prior to the termination of the Agreement on November 12, 2007.

You must determine whether Direct Source Imports, Inc. tortiously interfered with the contractual relationship between B&F and Lloyd LeBlanc as established by the Service Mark License Agreement. However, any tortious interference claim against Direct Source Imports, Inc. is limited to the time period between the incorporation of Direct Source Imports, Inc. on May 25, 2007 and the date the Agreement was terminated, November 12, 2007.

I will now instruct you on the law governing the tortious interference with contractual relations claims.

To establish a cause of action for tortious interference with contractual relations, B&F must establish: (1) the existence of a valid

contract; (2) that the defendant acted improperly and without privilege; (3) that the defendant acted purposely and maliciously with the intent to injure; (4) that the defendant induced a breach of contractual obligations or caused a party or third party not to enter into or continue a business relationship with the plaintiff; and (5) that the defendant caused B&F some financial injury. There is no dispute that the contracts at issue are valid.

In this context, improper conduct means wrongful action that generally involves predatory tactics such as fraud or misrepresentation, or use of confidential information.

The term malice in the context of a tortious interference claim means any unauthorized interference or any interference without legal justification or excuse.

29

Interference with a contractual relationship need not result in the breach of the contract to be actionable. It is sufficient if the invasion retards performance of the duties under the contract or makes the performance more difficult or expensive.

If you find for B&F on any of the tortious interference with contractual relations claims, you will then consider the issue of the amount of damages to be awarded. In that respect you should award B&F an amount of money shown by a preponderance of the evidence in the case to be fair and adequate compensation for such loss or damage, if any, as proximately resulted from the tortious interference. For damage to be the proximate result of such interference, it must be shown that, except for the tortious interference, such damage would not have occurred.

In considering the issue of B&F's damages, you are instructed that you should assess the amount you find to be justified by a preponderance of the evidence as full, just, and reasonable compensation for all of B&F's damages, no more and no less. Compensatory damages are not allowed as a punishment and must not be imposed or increased to penalize the defendants. Also, compensatory damages must not be based on speculation or guesswork because it is only actual damages that are recoverable.

Damages are given as compensation for injury; generally, such compensation is the measure of damages where an injury is of a character capable of being estimated in money. If an injury is small or the mitigating circumstances are strong, nominal damages only are given.

What would be a proper amount of nominal damages is a question for you to decide under all the facts and circumstances of the case.

Any person who claims damages as a result of an alleged wrongful act on the part of another has a duty under the law to mitigate those damages - that is, to take advantage of any reasonable opportunity that may have existed under the circumstances to reduce or minimize the loss or damage.

## LANHAM ACT AND RELATED STATE LAW CLAIMS

The third claims about which you heard evidence in this phase of the trial were B&F's Lanham Act and related state law claims.

You must decide whether Lloyd LeBlanc, Jeff LeBlanc, Jody LeBlanc, Edna LeBlanc, Maxam Wholesale of Atlanta, Inc., Direct Source Imports, Inc., Productos Mexicanos Don Jose, Inc., or LeBlanc's LLC infringed on B&F's trademark, as claimed by B&F.

I will now charge you on the applicable law for this claim.

A trademark is a word, a name, a symbol, a device, or a combination of them that indicates the source of goods or services. Subject to certain defenses, a trademark owner may enforce the right to exclude others in an action for infringement.

The owner of a trademark may obtain a certificate of registration issued by the United States Patent and Trademark Office. Afterwards, if the owner brings an action for infringement, the owner may rely solely on the registration certificate to prove that the

owner has the right to exclude others from using the trademark in connection with the types of goods or services specified in the certificate. The United States Patent and Trademark Office provides for what is called the Principal Register for trademarks. Registration on the Principal Register provides a presumption of the trademark's validity.

The United States Patent and Trademark Office also provides for what is called the Supplemental Register for trademarks. Registration on the Supplemental Register does not provide a presumption of the trademark's validity.

The owner of a trademark may enter into an agreement that permits another person to use the trademark. This type of agreement is called a license, and the person permitted to use the trademark is called a licensee.

In proving infringement of its trademark, B&F has the burden of proving each of the following by a preponderance of the evidence: (1) that it possesses a valid trademark; (2) that a defendant used the trademark without B&F's consent; (3) that the defendant's use of the trademark occurred in commerce; (4) that the defendant used the trademark in connection with the sale or advertising of any goods; and (5) that the defendant used the trademark in a manner likely to confuse consumers.

The Lanham Act defines the term "use in commerce" as the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. A mark shall be deemed to be in use in commerce on goods when it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents

associated with the goods or their sale, and the goods are sold or transported in commerce. In addition, use of a trademark in a domain name or as a key word or metatag may be use in commerce.

You must decide whether any of the defendants infringed on B&F's "MAXAM" trademark. B&F registered "MAXAM" on the Principal Register for certain categories of products. "MAXAM" is a valid trademark. You only need consider whether a defendant used the "MAXAM" mark in commerce without B&F's consent in connection with the sale or advertising of any goods in a manner likely to confuse consumers.

## LID KNOB TRADEMARK

You must also decide whether any of the defendants infringed on B&F's lid knob trademark. Because the lid knob trademark is

registered on the Supplemental Register, it is not presumed valid. B&F must establish by a preponderance of the evidence that the lid knob trademark is valid. Only if you determine B&F proved by a preponderance of the evidence that the lid knob trademark is a valid trademark should you consider whether B&F owns it or whether any defendant's action infringed it.

A valid trademark is a word, symbol, or device that is either: (1) inherently distinctive; or (2) descriptive, but has acquired a secondary meaning.

Only if you determine that the lid knob trademark is not inherently distinctive should you consider whether it is descriptive but became distinctive through the development of secondary meaning.

An inherently distinctive trademark is a word, symbol, or device, or combination of them, which intrinsically identifies a particular source of a good in the market. The law assumes that an inherently distinctive trademark is one that almost automatically tells a consumer that it refers to a brand or a source for a product, and that consumers will be predisposed to equate the trademark with the source of a product.

Trademarks are classified into the following categories of distinctiveness: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful.

A generic mark suggests the basic nature of the product or service. A descriptive mark identifies a characteristic or quality of a product. A suggestive mark refers to some characteristics of the product or service and requires an effort of the imagination by the

consumer in order to be understood as descriptive. An arbitrary or fanciful mark bears no logical relationship to the product it represents.

Suggestive and arbitrary or fanciful marks are deemed inherently distinctive because their intrinsic nature serves to identify a particular source of a product.

Generic marks are generally incapable of receiving trademark protection.

Descriptive marks, though not inherently distinctive, may become sufficiently distinctive to enjoy trademark protection by acquiring secondary meaning. A mark has acquired secondary meaning when the primary significance of the term in the minds of the consuming public is not the product but the producer.

If you decide that the lid knob trademark is suggestive or arbitrary or fanciful, it is considered to be inherently distinctive. An inherently distinctive trademark is valid and protectable.

On the other hand, if you determine that the lid knob trademark is generic, it cannot be distinctive and therefore is not valid or protectable.

If you decide that the lid knob trademark is descriptive, you will not know if the trademark is valid or invalid until you consider if it has gained distinctiveness by the acquisition of secondary meaning, which I will explain now.

Proof of secondary meaning in a trademark requires a showing that the mark has become distinctive of the trademark holder's product. In determining whether a trademark has acquired

secondary meaning, you should consider the length and manner of the mark's use; the nature and extent of advertising and promotion; the efforts made by B&F to promote a conscious connection in the public's mind between the trademark and B&F's business; and the extent to which the public actually identifies the trademark with B&F's goods.

B&F has the burden of proving that the lid knob trademark has acquired a secondary meaning.

Only if you determine the lid knob trademark is a valid trademark, will you consider whether any defendant used the lid knob mark in commerce without B&F's consent in connection with the sale or advertising of any goods in a manner likely to confuse consumers.

## COMMON LAW RIGHT TO "MAXAM WHOLESALE"

B&F also claims common law trademark rights to "Maxam Wholesale." B&F must show it acquired trademark rights in "Maxam Wholesale." Common law trademark rights are appropriated only through actual prior use in commerce. The use of a mark in commerce must be sufficient to establish ownership rights for a plaintiff to recover against subsequent users. B&F bears the burden of proving its prior use in commerce. I have already charged you on the definition of "use in commerce."

There is a two-part test to determine whether a party has proved prior use of a mark sufficient to establish ownership. First, evidence showing adoption must be presented. Second, evidence of use of the mark in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as

those of the adopter of the mark must be shown. Thus, the party that first adopts and uses the trademark in association with its goods, sufficient to form an association between the two in the public mind, establishes its common law rights to the mark. You should consider the totality of the circumstances surrounding the prior use of the mark to determine whether such notice or association is present.

If you determine B&F owns "Maxam Wholesale," you must determine whether "Maxam Wholesale" is a valid trademark. I have already charged you on how to determine whether a mark is valid. Only if you determine B&F owns "Maxam Wholesale" will you consider the validity of the trademark. If you determine B&F owns "Maxam Wholesale" and that it is a valid trademark, you will then consider whether a defendant used "Maxam Wholesale" in commerce without B&F's consent in connection with the sale or advertising of any goods in a manner likely to confuse consumers.

## FALSE DESIGNATION OF ORIGIN/UNFAIR COMPETITION

You must decide whether Lloyd LeBlanc, Jeff LeBlanc, Jody LeBlanc, Edna LeBlanc, Maxam Wholesale of Atlanta, Inc., Direct Source Imports, Inc., Productos Mexicanos Don Jose, Inc., or LeBlanc's LLC are liable for false designation of origin/unfair competition.

I will now charge you on the applicable law for this claim.

Under the Lanham Act, any person who makes use in commerce of any word, term, name, or symbol, or combination thereof, or any false or misleading designation of origin, or any false description or representation of fact, that is likely to cause confusion as to origin of that person's goods or services, that person's affiliation, connection, or association with another person, or the

endorsement or approval of the goods or services by another person is liable to any person who is or is likely to be damaged by the use.

In assessing the trademark infringement and false designation of origin/unfair competition claims, you must consider whether a defendant used a trademark in a manner likely to cause confusion. In determining whether there is or will be a likelihood of confusion, you may draw on your common experience as citizens of the community. In addition to the general knowledge you have acquired throughout your lifetimes, you should also consider the following factors: (1) the strength of B&F's trademark; (2) the similarity between B&F's trademark and the allegedly infringing trademark; (3) the similarity between the products and services offered by B&F and the defendant; (4) the similarity of the sales methods used by B&F and the defendant; (5) the similarity of advertising methods used by

B&F and the defendant; (6) the defendant's intent to misappropriate B&F's good will; and (7) actual confusion in the consuming public.

In light of these considerations and your common experience, you must determine if ordinary consumers, neither overly careful nor overly careless, would likely be confused as to the origin of the products, upon encountering the trademark belonging to B&F as the respective parties have used it in connection with the products. No one factor or consideration is conclusive, but each aspect should be weighed in light of the total evidence presented at the trial.

If you find for B&F on its claim for trademark infringement or its claim for false designation of origin/unfair competition, you must determine B&F's damages. B&F has the burden of proving damages by a preponderance of the evidence.

Damages means the amount of money that will reasonably and fairly compensate B&F for any injury you find was caused by the defendant's actions.

You should consider the following types of damages for the trademark infringement and false designation of origin/unfair competition claims: (1) B&F's actual damages; and (2) the defendant's profits. B&F's actual damages consist of its direct economic losses and out-of-pocket expenses resulting from the effect of the defendant's conduct on B&F.

You should consider whether any of the following exists, and if so to what extent, in determining B&F's actual damages: (1) any injury to B&F's reputation; (2) any injury to B&F's goodwill, including any injury to its reputation; (3) any loss of B&F's sales as a result of the defendant's infringement or false designation of origin/unfair

competition; (4) any loss of B&F's profits; (5) any expense of preventing customers from being deceived; (6) any cost of future corrective advertising reasonably required to correct any public confusion caused by the infringement or false designation of origin/unfair competition; and (7) any other factors that bear on B&F's actual damages. Any actual damages awarded must constitute compensation and not a penalty.

In addition to actual damages, if B&F prevails on its trademark infringement or false designation of origin/unfair competition claim, it may seek profits the defendant earned that are attributable to the infringement or false designation of origin/unfair competition, provided that B&F proves by a preponderance of the evidence: (1) that the defendant's conduct was willful and deliberate; (2) that the defendant was unjustly enriched; or (3) that an award of the defendant's profits will deter similar future conduct.

B&F may establish that the infringement or false designation of origin/unfair competition was willful if the defendant's conduct was not accidental, and was done knowingly or with disregard of B&F's rights.

B&F may prove the defendant was unjustly enriched if the defendant knowingly and deliberately profited from the goodwill of B&F through use of B&F's trademark, or enriched itself by tapping into the reputation and good will of B&F.

Finally, B&F may prove a need to deter similar future conduct where there is evidence that the defendant infringed the trademark to its financial advantage.

In the event you find that B&F is entitled to an award of profits, B&F may recover any of the defendant's profits that are attributable

to the trademark infringement or false designation of origin/unfair competition. However, you may not include in any award of profits any amount that you included in determining actual damages.

B&F is required to prove the defendant's gross sales. Then the defendant is required to prove by a preponderance of the evidence the portion of the profit attributable to factors other than use of the infringed trademark or false designation of origin/unfair competition, as well as expenses. Expenses are all operating, overhead, and production costs incurred in producing the gross revenue. The difference between gross sales and expenses is profit.

Unless you find that a portion of the profits from the sale of the goods using the trademark is attributable to factors other than use of the trademark, you must find that the total profit is attributable to the infringement.

B&F does not have to demonstrate actual damage to seek the defendant's profits.

If you decide B&F is entitled to recover for its trademark infringement or false designation of origin/unfair competition claims, you must also decide if the liable defendant's actions were malicious, fraudulent, deliberate, or willful. In this context willfulness can be established by evidence of willful blindness. Under the doctrine of willful blindness, knowledge can be imputed to a party who knows of a high probability of illegal conduct and purposefully contrives to avoid learning of it.

## GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT

There is also a claim that the defendants violated the Georgia Uniform Deceptive Trade Practices Act.

This claim is governed by the same standards as B&F's claim for false designation of origin/unfair competition under the Lanham Act. If you find in B&F's favor on its false designation of origin/unfair competition claim, your verdict must be for B&F on its claim under the Georgia Uniform Deceptive Trade Practices Act. If you find in the defendants' favor on B&F's false designation of origin/unfair competition claim, your verdict must be for the defendants on B&F's claim under the Georgia Uniform Deceptive Trade Practices Act.

If you find in B&F's favor on the Georgia Uniform Deceptive Trade Practices Act, you must determine whether the defendants willfully engaged in the trade practice knowing it to be deceptive.

## CYBERPIRACY

You must also decide whether Jeff LeBlanc's use of the "MAXAM" mark in the domain names <u>maxamwholesale.com</u> or <u>maxamwholesale.net</u> on the internet violated the Anticybersquatting Consumer Protection Act, or ACPA.

I will now charge you on the applicable law for this claim.

The ACPA provides trademark owners with a remedy against cyberpiracy, or the registration of another person's trademark as a domain name with the bad faith intent of profiting from the sale or use of the domain name.

To prevail on its claim under the ACPA, B&F must prove by a preponderance of the evidence that: (1) its mark is distinctive or

famous and entitled to protection; (2) Jeff LeBlanc's domain name is identical or confusingly similar to B&F's mark; and (3) Jeff LeBlanc used the domain name with a bad faith intent to profit.

In considering whether Jeff LeBlanc had a bad faith intent to profit, you may consider the following factors: (1) the trademark or other intellectual property rights of Jeff LeBlanc, if any, in the domain name; (2) the extent to which the domain name consists of the legal name of Jeff LeBlanc or a name that is otherwise commonly used to identify Jeff LeBlanc; (3) Jeff LeBlanc's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; (4) Jeff LeBlanc's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (5) Jeff LeBlanc's intent to divert customers from B&F's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the

intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (6) Jeff LeBlanc's offer to transfer, sell, or otherwise assign the domain name to B&F or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or Jeff LeBlanc's prior conduct indicating a pattern of such conduct; (7) Jeff LeBlanc's provision of material and misleading false contact information when applying for the registration of the domain name, Jeff LeBlanc's intentional failure to maintain accurate contact information, or Jeff LeBlanc's prior conduct indicating a pattern of such conduct; (8) Jeff LeBlanc's registration or acquisition of multiple domain names which he knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or

services of the parties; and (9) the extent to which the mark incorporated in Jeff LeBlanc's domain name registration is or is not distinctive and famous.

Any liability on the part of Jeff LeBlanc under the ACPA is limited to use of the domain names during the time period of May 31, 2007 to June 4, 2011.

If you find that Jeff LeBlanc violated the ACPA, you must determine the amount of money to award B&F, if any. B&F has the burden of proving damages by a preponderance of the evidence.

In determining B&F's damages for Jeff LeBlanc's improper use of the trademark, you should consider B&F's actual damages and any profits gained by Jeff LeBlanc from the improper use of the trademark.

If you find that Jeff LeBlanc violated the ACPA, you must also decide whether his actions were malicious, fraudulent, deliberate, or willful. In this context willfulness can be established by evidence of willful blindness. Under the doctrine of willful blindness, knowledge can be imputed to a party who knows of a high probability of illegal conduct and purposefully contrives to avoid learning of it.

## VICARIOUS LIABILITY CLAIMS

The final claims about which you heard evidence were B&F's vicarious liability claims. I will now charge you on the applicable law for each of those claims.

You must decide whether Lloyd LeBlanc, Edna LeBlanc, Jeff LeBlanc, and Jody LeBlanc engaged in a civil conspiracy. B&F

bears the burden of proof of showing a civil conspiracy by a preponderance of the evidence.

A conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means. To recover damages for a civil conspiracy claim, the plaintiff must show that two or more persons, acting in concert, engaged in conduct that constitutes a tort. Absent the underlying tort, there can be no liability for civil conspiracy.

Concert of action, amounting to conspiracy, may be shown by circumstantial as well as direct evidence.

After the conspiracy is formed, members of the conspiracy are jointly and severally liable for acts of co-conspirators done in furtherance of the conspiracy. It is not necessary to prove an

express agreement or compact among the wrongdoers; their common design may be inferred from the nature of the acts done, the relation between them, their mutual interests in the matter, and other circumstances.

You must determine whether Direct Source Imports, Inc. and Productos Mexicanos Don Jose, Inc. should be held jointly liable as a common business enterprise.

In order for two or more of the corporate defendants to be jointly liable under the theory that they were joint participants in a common business enterprise, B&F must prove the following by a preponderance of the evidence: (1) that at least one of the corporate defendants is liable to B&F under one of the theories of liability about which I have previously given you instructions; (2) that the corporate defendant found liable and either another corporate

defendant or both of the other corporate defendants substantially shared the same shareholders, officers, and managers; and (3) that any corporate defendant found liable and the other corporate defendant or defendants that substantially shared the same shareholders, officers, and managers, also held themselves out to the public as being components of a single business operation, so as to make them liable together.

If you find that Productos Mexicanos Don Jose, Inc. tortiously interfered with the Maxam Independent Distributor Agreement or the Service Mark License Agreement, you must determine whether Jeff LeBlanc or Jody LeBlanc, as corporate officers of Productos Mexicanos Don Jose, Inc., should be held personally liable for any torts committed by that corporation.

Similarly, if you find that Direct Source Imports, Inc. tortiously interfered with the Maxam Independent Distributor Agreement or the Service Mark License Agreement, you must determine whether Jeff LeBlanc or Jody LeBlanc, as corporate officers of Direct Source Imports, Inc., should be held personally liable for any torts committed by that corporation.

B&F bears the burden of showing by a preponderance of the evidence that the corporate officers should be held personally liable for the torts committed by the corporations.

Generally, one who merely occupies the capacity of a corporate officer cannot be held to be vicariously liable for such damages as would otherwise be recoverable from his corporate principal. However, there is an exception to this rule. An officer of a corporation who takes part in the commission of a tort by the

corporation is personally liable therefor, but an officer of a corporation who takes no part in the commission of a tort committed by the corporation is not personally liable unless he specifically directed the particular act to be done or participated or cooperated therein.

If you find that Maxam Wholesale of Atlanta, Inc. is liable for trademark infringement or false designation of origin/unfair competition, you must determine whether Lloyd LeBlanc, as a corporate officer of Maxam Wholesale of Atlanta, Inc., should be held personally liable for the trademark infringement or false designation of origin/unfair competition.

If you find that Productos Mexicanos Don Jose, Inc. is liable for trademark infringement or false designation of origin/unfair competition, you must determine whether Jeff LeBlanc or Jody

LeBlanc, as corporate officers of Productos Mexicanos Don Jose, Inc., should be held personally liable for the trademark infringement or false designation of origin/unfair competition.

If you find that Direct Source Imports, Inc. is liable for trademark infringement or false designation of origin/unfair competition, you must determine whether Jeff LeBlanc or Jody LeBlanc, as corporate officers of Direct Source Imports, Inc., should be held personally liable for the trademark infringement or false designation of origin/unfair competition.

B&F bears the burden of showing by a preponderance of the evidence that the corporate officers should be held personally liable for any trademark infringement or false designation of origin/unfair competition.

A corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for such infringement without regard to piercing of the corporate veil.

Of course, the fact that I have given you instructions concerning the issue of damages should not be interpreted in any way as an indication that I believe that either B&F as the plaintiff or Lloyd LeBlanc as the counterclaimant should, or should not, prevail in this case.

In this case you have been permitted to take notes during the course of the trial, and some of you have taken advantage of that opportunity and have made notes from time to time.

You will have your notes available to you during your deliberations, but you should make use of them only as an aid to your memory.  In other words, you should not give your notes any precedence over your independent recollection of the evidence or the lack of evidence; and neither should you be unduly influenced by the notes of other jurors.

I emphasize that notes are not entitled to any greater weight than the memory or impression of each juror as to what the testimony may have been.

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as telephone, cell phone, smart phone, iPhone, Blackberry, or computer; the internet, any internet service, or any text or instant messaging

service; or any internet chat room, blog, or website such as Facebook, My Space, LinkedIn, You Tube, or Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

Any verdict you reach in the jury room must be unanimous. In other words, to return a verdict you must all agree. Your deliberations will be secret; you will never have to explain your verdict to anyone.

It is your duty as jurors to discuss the case with one another in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury. While you are discussing the case do not hesitate to re-examine your own opinion and change your mind if you become convinced that you were

wrong. But do not give up your honest beliefs solely because the others think differently or merely to get the case over with.

Remember, that in a very real way you are judges - judges of the facts. Your only interest is to seek the truth from the evidence in this case.

In the jury room, Mr. Abell will continue to serve as the foreperson.

A form of verdict has been prepared for your convenience.

[Explain verdict form]

You will take the verdict form to the jury room and when you have reached a unanimous agreement the foreperson will fill in the verdict form, date and sign it, and then return to the courtroom.

If you should desire to communicate with me at any time, please write down your message or question and pass the note to the security officer, who will bring it to me. I will then respond as promptly as possible, either in writing or by having you come back to the courtroom so that I may address you orally. I caution you, however, with regard to any message or question you might send, you should not tell me, the security officer, or anyone else what your numerical division may be.

You may go now to the jury room, but do not begin your deliberations until I send you the pleadings, exhibits, and verdict form, which I will do shortly. Then you may begin your deliberations.